## C. M. WELLS ET AL. V. J. M. HOUSTON.

### Decided May 2, 1900.

**1. Rescission for Fraud—Cancellation of Deed—Pleadings—Charge.**

Where, in an action to rescind a contract and cancel a deed executed by plaintiff forming a part of it, on the ground of fraud, overreaching, inadequacy of consideration, and advantage taken of plaintiff's pecuniary necessity, the matter of advantage so taken of his pecuniary necessity is pleaded by plaintiff only in connection with other facts and circumstances altogether intended to be taken as grounds for the rescission of the contract, it was error for the court's charge to submit the taking of such advantage, in connection with inadequacy of consideration, as a separate and distinct ground authorizing the jury, on proof thereof, to find the deed fraudulent and subject to cancellation.

**2. Same—Taking Advantage of Pecuniary Necessity—Evidence.**

Nor did the evidence warrant a charge as to advantage taken of plaintiff's pecuniary necessity where it showed that the transaction in which the deed was made was an exchange of property in which no pecuniary consideration passed between the parties, or was contemplated by them.

**3. Same—Drunkenness as Avoiding Contract.**

If the deed was executed while plaintiff was in such a state of intoxication as deprived him of his understanding, and rendered him for the time non compos mentis, it was voidable for that reason, though the intoxication was voluntary and not brought about by the other party.

**4. Same—Drunkenness and Subsequent Ratification—Charge.**

It was error for the charge to submit the question of plaintiff's intoxication and the advantage taken thereof as a ground for canceling the deed without reference to the defense, pleaded and supported by evidence, that he had subsequently, and when sober, ratified the transaction.

**5. Same—Confidential Relations.**

Plaintiff's allegations that his father and the grantee's father had long been friends and were partners during the former's lifetime, and that plaintiff had entire confidence in the friendship of the grantee and his father, did not show such confidential relations between the parties to the deed as would raise the presumption of fraud and devolve on the grantee the burden of showing that it was free therefrom.

**6. Same—Fraud—Charge of Court.**

A charge was error which authorized a recovery by plaintiff for fraud without limiting it to the specific acts of fraud alleged in his pleadings.

**7. Same—Pre-Existing Debt.**

It was error for the court to instruct, in reference to a mortgage of the property subsequently executed by defendant to a third party, and which plaintiff also sought to have canceled, that the mortgagee was not a purchaser for value if he took the mortgage to secure a pre-existing debt, where there was no allegation or proof that the debt was a pre-existing one.

**8. Same—Special Charges with Qualifications.**

Error in the court's general charge in not submitting the matters pleaded in defense was not cured by giving special charges requested by defendant covering such matters, but to which charges the court attached qualifications not warranted by the law and facts of the case.

**9. Same—Ratification—Ignorance of Law.**

The rule that an act of ratification is not effectual as such if the party wronged supposes that the original contract is binding, does not apply where such supposition is erroneous and arises from ignorance of the law. See the opinion for full discussion of the principles applicable to ratification.

**10. Same—Right of Rescission Lost.**

A party seeking to rescind a contract for fraud must act with promptness, and dis-

affirm it within a reasonable time after discovering the fraud, and if, after such discovery, he does anything to carry the contract into effect or to obtain or claim its benefits, he can not thereafter repudiate it.

**11. Same—Conspiracy to Defraud.**

A third party, the father of defendant, could not be charged with liability for having conspired with and assisted defendant in defrauding plaintiff where the father took no part in the alleged fraudulent transaction,—his kindredship with defendant and his mere failure to meddle with the transaction after he knew of it, not being sufficient to constitute a conspiracy or to render him liable for defendant's acts.

**12. Same—Heir—Estate in Expectancy.**

Plaintiff's father by last will devised one-fourth of his estate to his wife, plaintiff's mother, and bequeathed the residue to their eight children, share and share alike, with a provision that it should not be divided until the youngest child should have married or reached majority. Held, that plaintiff was not, upon the father's death, an expectant heir as to his interest in his father's estate, but was such expectant heir as to the estates of his mother, brothers, and sisters, and a sale by him of this latter interest in expectancy to defendant was void in law, because presumed to have been upon inadequate consideration.

**13. Same—Notice—Inadequacy of Consideration.**

Plaintiff having conveyed together his vested interest in his father's estate and his expectant interest in the estates of his mother, brothers, and sisters, one who took from plaintiff's grantee a mortgage on all the interests so conveyed for a single and indivisible consideration, since he was charged by law with notice that the sale of the interests in expectancy was for an inadequate consideration, was thereby put on inquiry and notice as to the adequacy of the entire consideration for the transaction and conveyance by plaintiff to the mortgagor.

**14. Rescission—Tender Back of Property.**

In an equitable suit to rescind a contract involving a sale and exchange of both realty and personalty, it is sufficient for plaintiff to offer, by his pleadings, to do equity, without specifically tendering back the property or part of the purchase price he has received.

APPEAL from Gonzales. Tried below before Hon. M. KENNON.

*Harwood & Walsh* and *Burgess & Hopkins*, for appellants.

*Stewart, Lewis & Gordon, Atkinson & Abernethy*, and *McNeal & Jones*, for appellee.

NEILL, ASSOCIATE JUSTICE.—This suit was brought by J. M. Houston against C. M. Wells, J. B. Wells, and H. L. Kokernot, to cancel the deed made by plaintiff to C. M. Wells, hereinafter described, and also to cancel a deed of trust made by plaintiff to Ben N. Peck, trustee, to secure defendant H. L. Kokernot in payment of a certain sum of money.

As grounds for the cancellation of the instruments the allegations in plaintiff's petition are substantially: That the consideration recited in the deed from J. M. Houston to C. M. Wells was an undivided one-half interest in 200 head of cattle, and the transfer of the possessory rights of C. M. Wells to plaintiff in an undivided one-half interest in what is known as the Windmill pasture, containing 8000 acres in Guadalupe County; that the value of the hundred head of cattle and of the possessory rights of C. M. Wells to one-half of the pasture was not more than $1700, although it was represented by said Wells to plaintiff to be of the reasonable value of $5000 and that he, Wells, would convey such inter-

est to plaintiff in part consideration for the latter's interest in his deceased father's estate; that C. M. Wells represented to plaintiff, as an inducement to make the trade, that he, Wells, owned an undivided one-half interest in said pasture, and not a mere possessory right thereto, and in fact that he did not own such interest; that when plaintiff executed said deed he believed, and was caused by the representation of C. M. Wells to believe, that he was getting in value $5000, when in fact he was getting only $1700 worth of property; that all of said facts were known to C. M. Wells, and concealed from plaintiff by him for the purpose of defrauding plaintiff out of his inheritance in his father's estate, and his expectant interest in the estates of his mother, brothers, and sisters.

That at the time plaintiff executed the deed to C. M. Wells he was, and had for some years prior thereto been, addicted to the excessive use of intoxicating liquors, which incapacitated him from forming a correct judgment, or understanding business transactions; that when he executed the deed he was, and had been for some days prior thereto, drinking heavily of intoxicants, and was not in sound mental condition, and by reason thereof did not know the effect of said instruments; that he never intended to convey Wells anything except his interest in his father's estate, and especially did he not intend to convey his interest in the estate of his mother, and possible interest in the estate of either one of his brothers or sisters, and did not know that he was so doing or had done so. That at the time he was in debt, pressed by his creditors, and in actual or imagined need of money, which facts C. M. Wells knew, and took advantage of plaintiff's mental and financial condition, worked upon his credulity, and caused him to believe that he was making a good bargain, and getting the value of the property conveyed, when in fact the amount received by plaintiff was grossly inadequate, which fact was fully known to C. M. Wells.

After these allegations, the petition charges on information and belief, that C. M. Wells, in fraudulently causing plaintiff to convey his property, as alleged, for an inadequate consideration, was acting in concert and collusion with J. B. Wells, and under his advice and guidance; that J. B. Wells is the father of C. M. Wells, is a man of mature years, skilled and experienced in business affairs, was intimately acquainted with plaintiff's father, his business, condition and value of his estate, and knew at the date of said transfer to C. M. Wells that plaintiff's interest in said estate was worth not less than $25,000, and that his interest in the other property conveyed was of value not less than $10,000. That J. B. Wells conspired with C. M. Wells to defraud plaintiff of his said property; that there had been the closest relations of friendship and confidence existing between plaintiff's father and J. B. Wells, continuing up to the time of the former's death; that prior to and at the time of the death of R. A. Houston, plaintiff's father, he and J. B. Wells had been and were partners in various business undertakings; that when said transfer was made by plaintiff to C. M. Wells, there existed intimate busi-

ness and friendly relations between J. B. Wells and J. D. Houston, plaintiff's guardian and executor of his father's will; that plaintiff and C. M. Wells have been intimately associated together since boyhood, and the latter had always professed the greatest friendship for plaintiff, as had J. B. Wells, and that plaintiff entertained feelings of sincere friendship for both of them, and had entire confidence in the friendship professed by them for him; that relying on their supposed friendship, and because of his respect and confidence in them, plaintiff entered into said contract with C. M. Wells, and executed the aforesaid deed. That plaintiff was not then 23 years old, and was inexperienced in business, ignorant of the value of his interest in his father's estate and of the other interests conveyed by said deed, and of the fact that he had any reversionary or other interest in the estate of his mother or estates of his brothers and sisters, and he was influenced in the execution of said deed by his confidence in C. M. Wells and his father, and accepted as true the representations made to him by C. M. Wells in the transaction. That as an inducement for plaintiff to contract with him, C. M. Wells represented that J. B. Wells approved the transaction, and had authorized plaintiff to make said contract, and had given him the cattle and one-half interest in said pasture, to the end that he might make said contract and go into partnership with plaintiff in the stock business. That the formation of such partnership was the purpose and inducement of the trade between plaintiff and C. M. Wells, who urged the formation of such partnership as an inducement thereto.

That H. L. Kokernot took the deed of trust made by C. M. Wells to secure him, with full notice, actual and constructive, of the facts pleaded, and especially of the facts that the estate of R. A. Houston was a large and valuable one, and that plaintiff's interest therein so conveyed to C. M. Wells was of the value of $25,000, and knew when he took said mortgage that the consideration for the deed from plaintiff to C. M. Wells was inadequate and the conveyance fraudulent.

In his petition, plaintiff offered to refund to C. M. Wells the amount received in consideration for the property conveyed. It concludes with a prayer for cancellation of both instruments, and asks, in the event cancellation of the deed of trust should be denied, that he be subrogated to the rights of H. L. Kokernot therein, upon paying or securing him in the payment of the amount of money it was executed to secure, and that he have judgment against C. M. Wells and J. B. Wells for any such amount as may be required to pay or secure H. L. Kokernot.

By his answer C. M. Wells admitted the execution of the deed sought to be canceled, but denied all the allegations plead by plaintiff for its rescission. His answer contains special pleas setting up certain matters as ratification and acquiescence hereinafter recited in our statement of the undisputed facts.

J. B. Wells answered by a special exception to that part of the petition wherein judgment is asked against him in the event the court should decline to vacate the deed of trust from C. M. Wells to H. L.

Kokernot. His answer contains also a general denial, and a special denial of the allegation that he acted in concert and collusion with C. M. Wells or anyone else to defraud plaintiff of his property.

Kokernot in his answer admitted the execution of the deed of trust sought to be canceled, and alleged that it was taken by him in good faith to secure a valid and existing debt evidenced and created by and at the time said deed of trust was executed, and that when the indebtedness it was intended to secure was created, he had no knowledge of or cause to believe that any fraud, mistake, or overreaching had been practiced in procuring the execution of the deed from plaintiff, C. M. Wells; that he was ignorant of any of the facts alleged by plaintiff for the rescission of said deed, and that he acted in the usual course of business and upon the records of Gonzales and De Witt Counties, in which said deed was recorded, and in which counties the principal part of the lands conveyed were situated.

By a supplemental petition the plaintiff, in reply to the matters plead by C. M. Wells, in ratification and acquiescence, alleged that such transactions were in continuation of the purpose on the part of C. M. Wells and of the conspiracy between him and his father to defraud plaintiff; that the relation of confidence and trust existing between plaintiff and both said defendants, the situation of necessity upon which plaintiff was or imagined he was, the purpose of C. M. Wells to defraud him out of his property, and every fact and circumstance alleged in plaintiff's original petition with reference to the transfer by plaintiff to C. M. Wells of the interest he had in his father's estate, existed and were applicable to the transaction plead in ratification of said conveyance.

The special exception of J. B. Wells to plaintiff's petition was overruled; the case was tried before a jury, and the trial resulted in a verdict in favor J. M. Houston against all defendants. But the jury found by their verdict that the consideration paid to J. M. Houston for the deed aggregated in value $2020. A judgment was entered upon the verdict canceling both the original deed from J. M. Houston to C. M. Wells, and the deed of trust executed by the latter to secure Kokernot. Judgment was also rendered in favor of C. M. Wells against J. M. Houston for amounts aggregating $2020 found by the jury as the value of the consideration paid by the former to the latter for the property conveyed. It adjudged such amount to be an equitable lien on the entire interest of J. M. Houston in the estate of his father, and decreed that in the event plaintiff should fail or refuse to pay the same with interest thereon at the rate of 6 per cent within six months after final judgment, an order of sale should issue in favor of C. M. Wells. No right or lien is given Kokernot by the judgment on the fund thus adjudged in favor of C. M. Wells. From this judgment all three of the defendants have appealed.

Before entering upon the discussion and consideration of the questions raised by the assignments of error, we will, in order that the case may be more fully understood, here state such facts as are uncontroverted. By

the will of R. A. Houston, which was probated in the County Court of Gonzales County on the 9th day of February, 1894, the testator, after directing the payment of his debts and funeral expenses, devised one-fourth of all his property, separate and community, to his wife, Sallie J. Houston, and bequeathed to his children, Mollie Boothe, James M. Houston, Julia Houston, Dunn Houston, Maggie J. Houston, Sallie K. Houston, R. A. Houston, and Annie Houston, all the balance of the estate, real and personal, share and share alike.

It was specified in the will as the desire of the testator that there should be no partition of his estate until all his children shall have married or reached their majority, and that the whole of the estate should be held intact and undivided until that time, and that it should be managed, controlled, directed, and administered by his executor, who was given full power and authority to manage and control the entire estate, to sell, and make title to any property which the executor might sell for the maintenance and support of the testator's heirs. It also directed that the revenue arising from the estate in excess of what was necessary for the proper maintenance, support, and education of the heirs should be judiciously invested by the executor as might be deemed best. Besides, the will gave the executor full power to sell and dispose of so much of the property as should be necessary to pay the testator's just debts, and properly support and maintain his heirs.

J. D. Houston, a brother of the testator, was appointed executor of the will and guardian of the minor children, with the provision that no security should be required of him, and that no action should be taken in the County Court in the administration of the estate, other than to probate and record the will, return an inventory and appraisement of the estate, and file a verified list of approved claims against it.

After the will was probated, an inventory and appraisement of the property and a list of approved claims against the estate were filed in the County Court, J. B. Wells being one of the appraisers. The testator's wife elected to take under the will, and the executor qualified as such, and took charge of, administered, and managed the estate in compliance with the provisions of the will.

The interest of the testator's daughter, Julia, who married Mr. Priest after the will was executed, in the estate, was purchased after the testator's death by the executor for the benefit of the estate.

On October 5, 1896, while the estate was in the hands of and being administered by the executor, the plaintiff, J. M. Houston, by an instrument of that date, conveyed to the defendant, C. M. Wells, all his undivided one-seventh interest in and to all the real estate, chattels, cattle, money, notes, accounts, and property of whatever kind and wherever situated, to which he was then entitled under said will of his father, R. A. Houston, deceased, including his interest in the share of his sister, Julia Priest, which had been purchased by J. D. Houston, executor, for the benefit of said estate. Also all interest which he might thereafter inherit from his mother, Sallie J. Houston, and his brothers and sisters,

derived from the estate of R. A. Houston, deceased, and his mother, Sallie J. Houston. The consideration expressed is an undivided one-half interest in 200 head of cattle, and the transfer of the grantee's possessory right to an undivided one-half interest in what is known as the Windmill pasture, situated in Guadalupe County, Texas, containing about 8000 acres. This instrument was filed for record in De Witt County on October 13, 1896, and recorded there the next day. It was filed for record in Gonzales County on May 7, 1897, and recorded there on the same day.

On October 5, 1896, at the same time the foregoing instrument was made, C. M. Wells, by a written instrument of that date, assigned, transferred, released, and set over to J. M. Houston his (the assignor's) interest in and to an undivided one-half in that certain pasture containing 6000 acres adjoining the Willow Springs pasture on the west, and known as the Windmill pasture, situated in Guadalupe County. By this instrument Wells agreed to deliver immediate possession to J. M. Houston, his heirs and assigns, to the use of said undivided one-half interest, the possession and occupancy by him to be joint and concurrent with the assignor's, an undivided one-half of which was retained by him. Wells, by the instrument, guaranteed unto J. M. Houston the possession of the pasture against all persons claiming by, through, or under him. The consideration expressed in this instrument was the conveyance made to J. B. Wells by J. M. Houston of all the latter's undivided interest which he might then have or thereafter become entitled to as an heir of his father, R. A. Houston, deceased, or that he might inherit from his mother, S. J. Houston.

At the same time C. M. Wells executed to J. M. Houston an instrument which is as follows: "I, C. M. Wells, do hereby bind myself in part consideration of the conveyance to me by deed of even date herewith of his interest in his father's estate, R. A. Houston, deceased, and his mother's estate by James M. Houston, I do hereby agree and bind myself to sell and deliver unto him, the said James M. Houston, an undivided one-half interest in the following described cattle, to wit: One hundred and eighty-eight cows and twelve bulls, between the ages of three and eight years old, to the firm of Houston & Wells, by me, in which he shall own one-half interest, and the other one-half interest to be retained by me. And I bind myself to make good title to same."

At the same time and as a part of the transaction, the parties executed a contract in writing, which recites the sale by Wells of an undivided one-half of his possessory rights in the Windmill pasture, and of an undivided one-half interest in 200 head of cattle of J. M. Houston; and that in consideration thereof that Houston, by his deed of that date, had conveyed to Wells his interest in his father's and mother's estates. By this instrument, which recites upon its face it is in connection with and as collateral to the instruments recited, C. M. Wells agreed to bind himself, in case J. M. Houston should become dissatisfied with the partnership arrangement, or for any cause determine to withdraw from

the same at any time after four years from the 1st of April, 1897, to buy said pasture from J. M. Houston, with all its improvements, and to pay him therefor the sum of $3800 in money or property as should at the time be mutually agreed upon by them.

For the purpose of securing the performance of the above agreement, C. M. Wells at the same time executed a mortgage to J. M. Houston, which recited that the latter had conveyed to Wells all his interest, right, title, and estate in and to the estate of his father, R. A. Houston, deceased, and his mother, S. J. Houston; and that he, C. M. Wells, had entered into a contract with James Houston to the effect that should Houston become dissatisfied or for any cause determine, on or after four years from April 1, 1897, to sell and dispose of his interest in the Windmill property, that Wells would pay him in money or property, as should be mutually satisfactory to both, the sum of $3800 for Houston's interest in said pasture, covering all fences, improvements, and title which he may have or might thereafter acquire. The instrument then concludes as follows: "Therefore, for the purpose of securing the faithfull performance of the said contract on my part, I do hereby bargain, sell, convey, and grant unto him, the said James M. Houston, the following property, viz:" (Here the identical property described in the conveyance from J. M. Houston to C. M. Wells herein first mentioned is set out.) The instrument contains a defeasance clause in the event of the faithful performance of the contract, and power of sale in the event of defaults.

The three last named instruments were, on the 6th day of October, 1896, after their execution by the parties, sealed in an envelope upon which was then written the following: "Contracts and agreements between C. M. Wells and J. M. Houston, to be deposited to be delivered only to Houston and Wells in the presence of each other;" and, by agreement of both, were deposited in the vault of the bank of Miller & Sayers, with the understanding that they were to remain there until April 1st, when the cattle were to be delivered under the contract, or until both parties were present.

Subsequently Houston and Wells withdrew the papers deposited as before stated in the bank of Miller & Sayers, and by mutual consent abrogated and destroyed the contract by which Wells agreed to pay Houston $3800 for the Windmill pasture, if after four years the latter were dissatisfied, and also the mortgage made by Wells on the interest conveyed him by Houston in his father's estate to secure the same. In lieu of these instruments, on October 20, 1896, they had prepared and executed a new contract of the same tenor and effect as the original, save that it recites a consideration of $500 paid by C. M. Wells to J. M. Houston in cash, and contained an agreement of the former to pay the latter $3800 for the Windmill pasture, if after four years he should be dissatisfied. And to secure this new contract, C. M. Wells executed to Houston a mortgage on one-half interest in their partnership cattle. The papers thus changed and modified were sealed in an envelope, and re-

deposited in the bank of Miller & Sayers, with the same instructions and agreements as were the original papers for which they were substituted. The $500 recited paid was furnished to C. M. Wells by his father, J. B. Wells.

On April 17, 1897, the cattle were delivered, in pursuance of the contract, by C. M. Wells to J. M. Houston for the firm of Houston & Wells, and placed in the Windmill pasture, and the following receipt, which was drawn by Wells' attorney, was executed by Houston:

"GONZALES, April 26, 1897.

"Received of Chas. M. Wells one hundred and ninety-two cows and eight bulls in full compliance with the terms of a certain memorandum or contract of date October 6, 1896, in which, for the consideration therein specified, the said C. M. Wells agreed to deliver to me 200 head of cattle on April 1, 1897, the delivery having been made on April 17th, the time of delivery having been extended by mutual consent, and this is to be in full satisfaction of said contract in so far as it applies to the cattle contract.

(Signed) "JAMES M. HOUSTON."

Upon the date of the delivery of the cattle, Houston and Wells, as partners, took possession of them and the pasture, and remained in possession together until August 16, 1897, when the partnership was dissolved, and the dissolution evidenced by a writing, which is as follows:

"The State of Texas, Gonzales County.—Whereas, heretofore, to wit, on October 6, 1896, and October 20, 1896, a contract was entered into between C. M. Wells and James M. Houston, by which they acquired jointly and as partners 200 head of cattle and a right to use and occupy what is known as the Windmill pasture in Guadalupe County, with certain stipulations and conditions of future sale fully set out in said contracts; and whereas, we, the said James M. Houston and C. M. Wells, now desire to abrogate said contracts of parnership and divide said property, and to that end we have agreed and do hereby accept the following as a complete and mutually satisfactory division of our partnership property, to wit: That the said James M. Houston is to have the privilege of cutting and selecting from the whole of said partnership stock of cattle in the following brand, ⑪, one hundred dry cows which he agrees to receive and accept as his full share of said partnership assets. And the remainder of said stock with the pasture is to be turned over and delivered to the said C. M. Wells as his full share of said joint partnership assets. And this is intended to relieve and release the said C. M. Wells from his obligation heretofore given in the aforesaid contracts of October 20, 1896, to purchase back said pasture from the said James M. Houston for a stipulated sum of money; and this partition and division this day made is to be considered a full partition and settlement of all contracts and obligations heretofore made between the said C.

M. Wells and James M. Houston, touching their cattle and the aforesaid Windmill pasture. And we, the said James M. Houston and C. M. Wells, do this day and herein dissolve our cattle partnership heretofore existing under the name of Houston & Wells. And I, the said James M. Houston, do further agree to receive said one hundred head of cattle as soon as they can be gathered conveniently, and to remove them out of Gonzales County, and not hold them in Gonzales County for ranching or breeding purposes, so that there may be no conflict in the ownership and control of the said ⩍ brand, which is to be kept up by the said C. M. Wells.

"Witness our hands at Gonzales, this 16th day of August, 1897.

"C. M. WELLS,
"JAS. M. HOUSTON."

This instrument was acknowledged by both parties thereto on the 16th day of August, 1897, and filed for record on the 20th day of the same month in Gonzales County records, and duly recorded.

The transaction evidenced by the substituted contract of October 20, 1896, by the receipt dated April 26, 1897, and the writing of August 16, 1897, were the ones plead by C. M. Wells in ratification and acquiescence of the original contract of October 5th.

On January 1, 1898, C. M. Wells executed to Ben N. Peck, trustee, a deed of trust and chattel mortgage on his interest in all lands, moneys, cattle, notes, accounts, horses, or property of whatsoever kind and wheresoever situated, to which James M. Houston is entitled under the will of his father, R. A. Houston, deceased, including the interest of said James M. Houston in the share of his sister, Julia Priest, which was purchased by the executor, J. D. Houston, for the benefit of said estate. Also all interest of said James M. Houston which he may hereafter inherit from his mother, Sallie J. Houston, and all interest which J. M. Houston may inherit from his brothers and sisters derived from the estate of his said father, R. A. Houston, deceased, to secure H. L. Kokernot in a promissory note of even date of said instrument, executed to him by C. M. Wells for $10,045, and due January 1, 1908, with 8 per cent interest. This instrument was acknowledged on March 15, 1898, and recorded as a mortgage in De Witt and Gonzales counties, and registered as a chattel mortgage immediately following the date of its acknowledgment and delivery.

Other facts shown by the testimony, which are not disputed, and some of the evidence on controverted facts will be stated in connection with the consideration of some of the assignments of error, but no conclusion as to the probative force of the controverted facts will be drawn by us further than is necessary to the elucidation of the questions raised by the assignments, and it is not intended that our statements or comments on such evidence shall be given any consideration or weight by the jury in determining the issuable facts upon another trial.

As a number of the assignments of error assail the charge of the court, it will here, for convenience in the consideration of such assignments,

be inserted in full. It, after a statement of the pleadings, together with the special charges given, is as follows:

"1. The burden of proof is upon the plaintiff to establish by a pre·ponderance of the evidence the facts necessary to his recovery. By a 'preponderance of the evidence' is meant that which, in your opinion, has the greater weight.

"2. If you find from the evidence that at the time plaintiff, J. M. Houston, made the deed hereinbefore mentioned, to C. M. Wells, he was in such a condition of pecuniary necessity and distress as would be likely to cause a person similarly situated to make an undue sacrifice of his property, and such condition was then known to C. M. Wells, and that C. M. Wells took advantage of such condition to obtain said deed from him, and if you find that the same was unfair and made upon inadequate consideration, then you should find that such transfer was fraudulent.

"3. If you fail to find that there were circumstances of fraud, procurement, or undue advantage by C. M. Wells in obtaining said deed from J. M. Houston, but if you find from the evidence that at the time of the execution thereof the mental faculties of the said Houston had become so impaired or damaged by the excessive indulgence in intoxicating drink that he was unable to comprehend the nature of the transaction between him and the said Wells and of his own acts, then you are instructed that you should find that said deed was invalid at the time of its execution. If you find from the evidence that the plaintiff's mental faculties were not impaired to the extent herein indicated, and that he was not absolutely and completely intoxicated at the time of the execution of such deed, but if you find from the evidence that at such time he was under the influence of intoxicating drink sufficiently to materially affect and interfere with his reason, judgment, and will, and that such condition was then known to C. M. Wells. and that his condition was unfairly taken advantage of by the said C. M. Wells, and made the opportunity for securing from him the deed above mentioned for an inadequate consideration, then you will find that such deed was invalid.

"4. Wherever there exists, between persons, relations, whether social, professional or personal kind, wherein there exists such a confidence, of whatsoever character, as enables the person in whom the confidence or trust is reposed to exert influence over the person trusting, no transaction between such persons will be permitted to stand, unless there has been the fullest and fairest explanation and communication of every material particular relative to it resting in the breast of the one who seeks to establish a contract with or obtain a deed from the person so trusting him; in other words, wherever two or more persons stand in such relation that, while it continues, confidence is necessarily reposed by one, and influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused or the influence exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential rela-

tion had existed. If you find from the evidence that such relations existed between the plaintiff and the defendants, C. M. and J. B. Wells, that plaintiff reposed such confidence in them, and acted thereon, and that defendant, C. M. Wells, when he obtained the deed from plaintiff, failed to make full and fair explanation and communication of every material particular affecting such transaction, and which was known to C. M. Wells and unknown to plaintiff, and the consideration for the transaction was inadequate, then you will find that such deed was procured by fraud.

"5. You are instructed that the interest conveyed by plaintiff J. M. Houston in the estates of his mother and his brothers and sisters, was a conveyance of an interest which is known in law as an expectancy. If the consideration is shown to be inadequate, then the law makes such transaction fraudulent. In regard to this expectant interest, if you fail to find that the consideration paid by C. M. Wells for the plaintiff's interest in his father's estate and his expectancy in his mother's estate, and that of his brothers and sisters, was adequate, you will find for the plaintiff as to such expectancy, regardless of any other consideration than such inadequacy of consideration.

"6. If you find from the evidence that the deed in question was obtained by fraud, or that it is invalid for any of the reasons set out in the second, third, or fourth paragraphs of this charge, then you will find a general verdict in favor of the plaintiff and against the defendant Charles M. Wells.

"7. If you should find such general verdict for the plaintiff against C. M. Wells, then you will find from the evidence whether or not the defendant H. L. Kokernot is a mortgagee for value and in good faith. If you find from the evidence that the creation of the debt mentioned in the deed of trust from C. M. Wells to Ben N. Peck for the benefit of H. L. Kokernot was contemporaneous with the execution of such trust deed, or if at the time of the creation of such debt it was understood and agreed upon by Kokernot and C. M. Wells that such trust deed should be executed, and such agreement was one of the considerations moving Kokernot to make the trade with Wells, and that such trust deed was executed by Wells in pursuance of such agreement and understanding, and that at the time of such agreement and understanding, and that at the time of the execution of such trust deed Kokernot had no notice of any vice in the deed from J. M. Houston to C. M. Wells, you will find for the defendant Kokernot, although you may find the deed was fraudulent or otherwise invalid.

"8. Upon the question of notice by H. L. Kokernot, you are instructed that whenever a mortgage holds under a conveyance, and is obliged to make out his title through that deed, or through a series of prior deeds, he has constructive notice of every matter connected with or affecting the estate covered by the mortgage, which appears either by description of parties, by recital, by reference, or otherwise on the face of any deed which forms an essential link in the chain of instruments

through which he must derive his title. The mortgagee under this rule is charged with notice of every provision in each separate instrument constituting the entire series by which his own interest can be affected, from which others have derived or may derive any right. Not only is he thus charged with a constructive notice of everything material in the deeds which form the direct chain through which his title is adduced, but if any of these conveyances should contain a recital or reference to another deed or instrument otherwise collateral and not a part of the direct series, he would, by means of such recital or reference, have notice of this collateral instrument, of its contents, and all the facts indicated by which it might be ascertained through inquiry prosecuted with reasonable diligence, and such notice extends to all deeds and other instruments falling properly within the preceding rules, whether recorded or unrecorded. The deed from J. M. Houston to C. M. Wells shows upon its face the conveyance of an expectancy, in so far as the conveyance of his expectant interest in the estates of the mother and the brothers and sisters of plaintiff is concerned, and the defendant Kokernot was thereby put upon inquiry as to the adequacy of the consideration for the property conveyed by such deed; and should you fail to find that such consideration was adequate, you will find for the plaintiff and against the defendant Kokernot, so far as his mortgage may affect such expectancy.

"9. One who takes a mortgage to secure a pre-existing debt is not a mortgagee for value. Therefore, if you find from the evidence that the debt from Charles M. Wells to H. L. Kokernot mentioned in the deed of trust was created prior to the execution thereof, and without reference to such execution; and if you find a general verdict in favor of the plaintiff against C. M. Wells, then you will also find a general verdict in favor of the plaintiff against the defendant H. L. Kokernot, regardless of any notice or want of notice on the part of Kokernot.

"10. The defendants have in their answer plead that even if there had been any vice in the original contract between C. M. Wells and J. M. Houston, that subsequently thereto, to wit, on the 16th day of August, 1897, that with a full knowledge of those facts which could, under the pleadings, have in any way affected the validity of the original exchange, that the said J. M. Houston and C. M. Wells did mutually execute a dissolution of the partnership and a partition of the effects, wherein there was an express release of all antecedent contracts between them. The plaintiff admits the execution and delivery of this paper, and you are instructed that by that paper there was a complete release and ratification of the matter in controversy in this case, and upon this issue you should find for all the defendants, regardless of the validity of the original transaction. But this instruction must be considered in connection with that which immediately follows.

"11. The release mentioned in the next preceding paragraph of this charge is not binding upon the plaintiff, if fraud has been committed by C. M. Wells in the original transaction, and at the time of the execution

of the release the plaintiff was ignorant of the material facts of such fraud, or if the plaintiff supposed the original transaction was binding.

"12. If you find a general verdict in favor of the plaintiff, then you will find, and state in your verdict, what was the value, at the time of the original transaction, of the undivided half interest in the two hundred head of cattle and the possessory right in the Windmill pasture.

"13. By the expression 'adequate consideration,' is meant the market value of the property at the time of the transaction, taking into consideration all the surrounding circumstances. 'Inadequate consideration' is a consideration falling short in any material degree of the market value."

Special charges given at the request of plaintiff:

"1. If you find from the evidence in this case that the consideration for which plaintiff executed the conveyance to C. M. Wells, sought in this action to be set aside, is so grossly inadequate for the property conveyed that such inadequacy shocks the conscience, then you will find that such conveyance was procured by fraud.

"2. If you find for plaintiff against C. M. Wells, but find in favor of defendant H. L. Kokernot upon the issue tendered by him that he was an innocent mortgagee for value of the property conveyed by plaintiff to C. M. Wells, then you will determine, under the pleadings and proof and this instruction, the right of plaintiff against J. B. Wells, if any.

"If you find that C. M. Wells did defraud plaintiff, and that defendant J. B. Wells conspired with him, by which is meant combined with him, and acted in concert with him, in perpetrating said fraud, then you will find against said J. B. Wells, even though you should find that he himself did not actually make any misrepresentations to plaintiff J. M. Houston, or receive any part of or profit by or from the fraudulent transaction. The essence of conspiracy, as here used, is a concert or combination to defraud, actually resulting in damage or loss to the party defrauded.

"If you find that there was such concert and combination between C. M. and J. B. Wells, the acts done and declarations made by each of said parties to such combination relating thereto, and made or done before the consummation of said combination, are evidence against the other, though made or done in such other's absence.

"3. The court has admitted evidence by Alex. Priest that J. D. Houston stated that the value of the interest of Mrs. Julia Priest in her father, R. A. Houston's estate, was $2500. You are instructed that this evidence was not admitted to be considered by you in determining the value of the interest sold by plaintiff to C. M. Wells; and you will not consider it for that purpose, but will consider it solely, if you find that such statement was made, to the extent that it may in your judgment affect the credibility of said J. D. Houston. If you believe the statement was not made by J. D. Houston, you will not consider the evidence for any purpose.

"4. The deed from J. M. Houston to C. M. Wells shows the convey-

ance by said Houston to said Wells of whatever interest he might have or acquire in the estates of his mother, his brothers, and sisters. The law presumes that the acquisition of these interests by said C. M. Wells was by fraud. The defendant Kokernot is in law conclusively held to know of such deed, and the presumption of fraud attaching to the acquisition of the interests secured. You will determine whether the knowledge of Kokernot of these facts and of the legal presumption attaching to the same was sufficient to put a reasonably prudent man upon inquiry as to whether or not the interest in his father's estate by said Houston in said deed conveyed was procured by fraud. If you find that it was, and that such inquiry, if made and pursued with reasonable diligence, would have led to the knowledge of said fraud, then you are instructed that said Kokernot is not an innocent purchaser."

Charges asked by defendant and given:

"1. Mere inadequacy of price, or the fact that a hard bargain has been driven, is of itself no valid ground for setting aside a contract made by a man of sound mind and fair understanding. In order to consider the question of the value of the property received by J. M. Houston, you must find that, in addition to inadequacy of price, there was some relation of confidence and trust, as has been already explained to you, and in the absence of such confidential relation, you will not consider the question of adequacy of price, unless you shall find the inadequacy so great as to shock the conscience by its statement.

"2. If you believe from the preponderance of the evidence in this case that plaintiff James M. Houston was, on the morning of the 6th day of October, 1896, when he admits that he executed the deed to C. M. Wells, drunk, to the extent of complete intoxication, so as to be no longer under the guidance of reason, and unable to comprehend the transaction, and that while in that condition he did execute the deed sought to be set aside, then you are instructed that said deed is not valid, and it should be set aside, unless afterwards, when sober and in his right mind, he ratified and confirmed the same, as will hereafter be explained to you. If, however, he was in such a mental condition as to understand the nature of the transaction and what disposition he was making of his property at the time, the fact that he was drinking, or had been drinking, would not be sufficient to avoid the deed in suit. And in connection with this plea of drunkenness, you are instructed that the parties who sign and execute written instruments are presumed in law to be sober and competent to make them, and the burden is on J. M. Houston, and not the defendants, to prove by the preponderance of the evidence that at the time he executed said deed he was under the influence of drink to the extent that he could not understand what he was doing.

"3. That if you should find that J. M. Houston was so drunk on the 6th day of October, 1896, when he executed the first papers, that he did not understand what he was doing, or from the effect of previous hard drinking, his mind was so impaired that he could not understand the nature of the transaction, but that afterwards, while sober, he did un-

derstand the nature of the transaction, and after fully understanding the nature of the transaction he did agree to change the contract by the terms of which J. M. Houston received the sum of $500 in cash, and received and used said cash with a full understanding of the transaction at that time, that this would be a ratification of the whole trade; and if you so find, you will render a verdict in favor of the defendants."

This charge was given with the following qualification: "If the act of ratification is simply a continuance of the former transaction, or if the party wrongly supposes that the original contract is binding, or if he has not full knowledge of all the material facts and of his own rights, no act of confirmation is effectual."

"4. That if you should find that J. M. Houston was so drunk on the 6th day of October, 1896, when he executed the first papers, that he did not understand what he was doing, or that from the effect of previous hard drink his mind was so impaired that he could not understand the nature of a transaction, and if you should further find that when J. M. Houston went back, on October 20, 1896, and had the previous contracts changed, by which J. M. Houston got $500 in cash, and spent it, that still he, the said J. M. Houston, did not understand what he was doing, but if you believe that afterwards, on April 17, 1897, the said J. M. Houston received the said cattle, and acknowledged that the cattle then received by him was in full compliance with the previous contracts; and if you believe that at this time the said J. M. Houston knew and understood the nature of his previous trade, and that with this knowledge he accepted the cattle as a fulfillment of the contract in part, then you are instructed that this, in law, would be a ratification of the said trade, and you will find for the defendants."

This charge was given with the following modification: "If the act is simply a continuance of the original transaction, or if the party wrongly supposes that the original contract is binding, or if he has not full knowledge of all the material facts and of his own rights, no act of confirmation is effectual."

"5. That if you should find that J. M. Houston was so drunk on the 6th day of October, 1896, when he executed the first papers, that he did not understand what he was doing, or that from the effect of previous hard drink his mind was so impaired that he could not understand the nature of a transaction; and if you should further find that when J. M. Houston went back on October 20, 1896, and had the previous contracts changed, by which he, J. M. Houston, go $500 in cash, and spent it, and still he, the said J. M. Houston, did not understand, and was not legally bound by said trade; and if you further believe that when afterwards, to wit, on April 17, 1897, the said J. M. Houston received the said cattle, and acknowledged that the cattle then received by him was in full compliance with the contract to be performed on that date, and that at that time the said J. M. Houston was so drunk that he did not know what he was doing, or did not have sufficient sense to know what he was doing, but if you believe that after he took possession of the cat-

tle, and before he dissolved the partnership, he did understand the trade he had made, and fully understood the trade he had made, and that with this knowledge he remained in the possession of the said cattle, and failed to try or offer to rescind the trade, this would be acquiescence on his part in the trade, and he can not afterwards break it; and if you so find, you will find for the defendants."

This charge was given with the following modification: "If the party wrongly supposes the original contract is binding, or if he has not full knowledge of all the material facts affecting the original transaction, no act of confirmation is effectual." ·

"6. The deed from J. M. Houston to C. M. Wells conveys not only the interest which he inherited from his father's estate, but also any interest which he may inherit from his mother's estate or his brothers and sisters. The deed from C. M. Wells to J. M. Houston conveying the Windmill pasture, which was admitted to have been in his possession or subject to his control, also recites the first deed, and that it conveys the interest of the father's estate and of the mother's. The jury are instructed that, after admitting the execution of these papers, the plaintiff is conclusively presumed to know what the papers contained. This is what is known in law as an estoppel by deed, and he will not be permitted to deny any of the contents of said deed.

"7. If you find from the evidence that at the time plaintiff executed the written dissolution of the partnership he had then discovered he had been in any material manner defrauded, and that with such knowledge he executed the same, the said instrument estops his recovery herein, even though you should find from the evidence he afterwards discovered other facts of fraud."

The second paragraph of the court's charge is assigned as error upon the ground that no facts were proven authorizing the court to give a charge on pecuniary necessity, and that the pleadings of appellee do not present a case authorizing the presentation of a charge upon that subject. The paragraph is taken from Pomeroy's Equity Jurisprudence, volume 2, section 948, and announces a well established principle of equity. But to authorize it to be given in charge to a jury, the case made by the pleadings and evidence must be one to which the principle is applicable. The pleadings in this case are not such as make the pecuniary necessity of appellee, together with inadequacy of consideration, a distinct and separate ground for the cancellation of his deed. It is plead in connection with other facts and circumstances which altogether are intended to be taken as grounds for rescission of the contract. To authorize the rescission of a deed on account of the pecuniary necessity of the grantor, such necessity must be such as would show he would be likely to make an undue sacrifice, and it must appear from the evidence that advantage was taken of his condition to obtain from him a conveyance which is unfair and made upon an inadequate consideration. If there is nothing but inadequacy of price, the case must be extreme in

order to call for the interposition of equity. But when the accompanying incidents are inequitable and show bad faith, such as concealments, misrepresentations, undue advantage, ignorance, weakness of mind, incapacity, pecuniary necessity, and the like, such circumstances, or any of them, combined with inadequacy of price, may easily induce the court to grant affirmative relief. They operate to throw the burden of proof upon the party claiming the benefits of the transaction to show that the other acted voluntarily, knowingly, intentionally, and deliberately, with full knowledge of the nature and effect of his acts, and that his consent was not obtained by any oppression, undue influence or undue advantage of his condition, situation or necessities. If the party upon whom the burden is thus cast succeeds in showing the perfect good faith of the transaction, it will be sustained. If he should fail, equity will grant affirmative relief. 2 Pom. Eq., sec. 928, and authorities cited in notes.

The evidence in this case does not tend to show that appellee, when the conveyance sought to be annulled was made, was in such pecuniary necessity as would be likely to cause him to make an undue sacrifice of his property. If it tended to show such condition, it clearly appears from the evidence and the very nature of the transaction that he was not induced to make the deed by reason of pecuniary necessity, for the transaction between him and C. M. Wells was not such as would relieve present pecuniary necessity or distress, and if appellee had any intelligence at all, he must have known when he made the deed that the consideration to be received by him would afford no present relief to his pecuniary necessities, if they existed. The transaction was an interchange of property, and no pecuniary consideration passed between or was contemplated by the parties, and appellee knew, if he knew anything, that his pecuniary condition would be the same when the trade was consummated as it was before. We conclude, therefore, that the second paragraph of the court's general charge should not have been given.

It is assigned as error that the third paragraph of the charge is upon the weight of the evidence, in that the beginning clause intimates to the jury that there are circumstances of fraud, procurement, or undue advantage on the part of C. M. Wells, but fails to explain what in law would constitute these technical or equitable offenses; and, in stating circumstances which would render the deed invalid on the ground of intoxication, assumes that the conveyance from Houston to Wells was for an inadequate consideration. The obvious purpose of the first sentence is to instruct the jury that if they should fail to find from the evidence circumstances of fraud in the procurement of the deed or undue advantage taken by the grantee over the grantor in its obtention, but should find from the evidence that the grantor's mind had become so impaired by intoxication as to render him incapable of comprehending the nature of the transaction and of his own acts, the deed would be invalid. It would have perhaps been more accurate in the first clause to have limited the cicumstances of fraudulent procurement and undue influence to those alleged and upon which evidence was adduced, for the jury may

have been misled by its generality into considering matters of fraud not in issue.

We do not understand the first sentence of the paragraph to have any relevancy to the question of inadequacy of consideration. An express contract entered into when the obligor is in such a state of intoxication as deprives him of his understanding, is voidable; and the party may, for that cause, avoid it, although the intoxication was voluntary, and not procured through the circumvention of the other party. 11 Am. and Eng. Enc. of Law, 773. To avoid a contract on this ground the obligor must have been so drunk as to have dethroned reason, memory, and judgment, and impaired his mental faculties to an extent that would render him non compos mentis for the time being, especially where there is no pretense that any person connected with the transaction aided in or procured the drunkenness. Bates v. Ball, 72 Ill., 108; Johns v. Fretchey, 39 Md., 258. When intoxication to this extent is shown, inadequacy of consideration is not absolutely essential to its rescission. When the intoxication is not thus absolute and complete, but is still sufficient to materially affect and interfere with the person's reason, judgment, and will, but is not procured nor taken advantage of unfairly by the other party, a court of equity will not interfere in behalf of the parties to a contract which is made while one of them is in such condition. 2 Pom. Eq., sec. 949.

The question of the existence of such a complete state of drunkenness on the part of J. M. Houston at the time he executed and delivered the deed as would authorize the court to submit it as a ground, independent of any other facts or circumstances, for cancellation of the instrument, is not raised by the assignment, but it may be a question worthy of serious consideration by the trial judge when this case is again tried.

It is also urged by appellants that the last sentence in the third paragraph of the charge is erroneous, in that it instructs the jury that the circumstances there stated would render the deed invalid and constitute a ground for its rescission, without qualification, and omits to instruct the jury on the defenses plead, and regardless of them, authorizes a verdict for the plaintiff. If the jury found the facts submitted in the sentence of the paragraph referred to, their existence, without qualification, would be sufficient ground for rescinding the deed. For we understand the rule to be that if a grantor, at the time he makes a deed, is so intoxicated as to materially interfere with his reason, judgment, and will, and the grantee, knowing such to be his condition, unfairly takes advantage of it and makes it the opportunity of securing the deed for an inadequate consideration, equity will grant affirmative relief. The authorization of a verdict in favor of appellee upon the finding of facts submitted by this part of the charge, without regard to matters plead in defense, was error, unless the issues raised by the defensive pleadings and evidence were submitted in the special charges given at the request of appellant. As to whether they were so submitted, will be considered further on.

The sixth paragraph of the general charge is objected to by appellants upon the grounds that the doctrines of "confidential relations and undue influence" are submitted in an argumentative form, there being nothing in the pleadings or proof to the effect that defendants had exerted any undue influence upon the mind of plaintiff; (2) that it assumes the fact that such influence existed and was exerted, and does not submit it to be determined by the jury; and (3) there was neither plead nor proved the existence of such relations between the parties as required the defendants to make any disclosures or explanations.

Professor Pomeroy, in his book on Equity Jurisprudence, under the subject, "Transactions Presumptively Invalid between Persons in Fiduciary Relations," in volume 2, section 956, after saying, "While equity does not deny the possibility of valid transactions between the two parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which a superior party obtains a possible benefit, equity raises a presumption against its validity and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption," then states the one principle underlying the whole subject both in its negative and affirmative form. It is from his statement of the principle thus made that the part of the charge under consideration is taken. He then classifies the cases which depend upon the single general principle into two kinds. "The first class," he says, "includes all those instances in which the two parties consciously and intentionally deal and negotiate with each other, each knowingly taking part in the transaction, and there results from their dealing some conveyance, or contract, or gift." To this class, if such a fiduciary relation as is in contemplation of the author in his treatment of the subject is brought within the pleadings and evidence, this case belongs. We need not, therefore, state or say anything in relation to the second class. The question then is, is the case made by the pleadings and evidence one to which the principle stated in the part of the charge complained of is applicable? In other words, are such fiduciary relations plead and facts proven as raise a presumption against the validity of the deed sought to be canceled, and cast upon the defendants the burden of proving affirmatively its compliance with equitable requisites? The fiduciary relations comprehended by the principle are most generally such as trustee and beneficiary, principal and agent, attorney and client, guardian and ward, and the principle may be said to extend to all persons who occupy a position of trust and confidence and dependence in fact, although not perhaps in law. 2 Pom. Eq., sec. 963. None of such fiduciary relations as we have just enumerated is averred by the plaintiff in his pleadings. It is unnecessary to reiterate the averments in the petition upon which this part of the charge is evidently predicated. The substance of them can be seen by referring to our statement of the case, and is found in the paragraph charging a conspiracy between C. M. and J. B. Wells to defraud the plaintiff. The facts of the existence

of intimate relations of friendship between J. B. Wells and plaintiff's father, continuing until the latter's death; the existence of intimate and friendly relations between J. B. Wells and J. D. Houston, the executor of the will; that J. B. Wells professed great friendship for plaintiff; that plaintiff entertained confidence in the professed friendship, if established, would certainly not tend to prove any such fiduciary relation between plaintiff and C. M. Wells as would affect the validity of a transaction between them. According to the undisputed testimony of plaintiff himself, and all the witnesses who had any knowledge of the transaction, J. B. Wells was not known in it. He never said a word nor did anything to induce plaintiff to make the trade, nor is there anything in the record that even tends to show that he was thought of by the plaintiff from the time the negotiations commenced until the trade was fully consummated. How then can it be said that there existed any such relations of trust and confidence between J. B. Wells and plaintiff as would exert any influence over the latter in dealing with another party, or require any explanation or communication to plaintiff by J. B. Wells of any matter relating to the transaction? But suppose such relations of trust and confidence did exist between J. B. Wells and plaintiff, is C. M. Wells affected by them, and is he to be held accountable for influence of his father over the plaintiff, and his failure to make disclosure? It is enough to hold the parties to a transaction responsible for advantage taken of fiduciary relations existing between themselves, without extending the responsibility to such relations as may exist between one of the parties to a stranger to the transaction. If one not a party to a contract does not meddle in it, neither law nor equity will meddle with him. Therefore, we may let J. B. Wells alone, and consider whether the allegations and proof as to C. M. Wells make a case to which the principle of fiduciary relations under consideration is applicable. Plaintiff and C. M. Wells had been intimately associated together since boyhood, and the latter had always professed the greatest friendship for the former, and plaintiff entertained feelings of sincere friendship for C. M. Wells and had entire confidence in his professed friendship. This is the effect of the allegations upon which it is sought to establish the fiduciary relation between the parties. Admit that the allegations are proved, then the relations of intimate friendship may be considered alleged and established. This is not a relation from which the law will infer such confidence and influence as raises a presumption against the validity of a transaction and casts upon the party obtaining the advantage the burden of proving its compliance with equitable requirements. Although friends in fact, in law and equity the parties were strangers, and stood at arm's length in the matter of contract. Friendship is unknown to law or equity, and in it neither finds any relation involving special confidence. Hemingway v. Coleman, 44 Conn., 390, 44 Am. Rep., 243; Robbins v. Hoke, 57 Cal., 493; Cower v. Cornell, 75 N. Y., 91, 31 Am. Rep., 428; 1 Bigelow on Fraud, 262. No superiority of one person over the other can be presumed to exist from the relation of friendship. It

appears from the evidence that the plaintiff had equal knowledge or the same means of knowledge of the value of property that C. M. Wells had. When the minds of persons capable of binding themselves meet in a contract of sale, neither standing in any relation to the other imposing a trust or begetting confidence, with equal knowledge or means of knowledge of the subject matter of the contract, in the absence of actual fraud a court of equity will not intervene because of inadequacy of price. Hemingway v. Coleman, supra. One may take advantage of another's friendship by fraudulent means, and overreach him so as to render a contract between them voidable, but in such case its invalidity rests upon actual fraud, and not upon fraud presumed from fiduciary relations. We conclude, therefore, the principle announced in the part of the charge complained of has no application to a case such as the pleadings and evidence show the one under consideration to be. The principle being inapplicable to the case renders it unnecessary to pass upon the second objection to the charge, or the applicability of the rule, which obtains in this State, "that it is error to charge as to a presumption arising from a given state of facts except in those cases in which the law raises a conclusive presumption," to the presumption arising from fiduciary relations. In this connection we will say that the court erred in refusing to give the charge requested by appellants, to the effect that the evidence fails to show such confidential relations between the parties as would, in law, render a contract between them void.

It is urged by appellants as an objection to the sixth paragraph that it, in addition to grounds plead by appellee, upon which instructions had been given, authorized the jury to determine whether other grounds existed, and if they should so find, to return a verdict for plaintiff. The charge is undoubtedly open to this objection. The second, third, and fourth paragraphs of the charge submitted every ground alleged by the plaintiff for a rescission of the deed. To then instruct the jury if they should find from the evidence that the deed was obtained by fraud to find a general verdict for plaintiff against the defendant C. M. Wells, was to invite them to explore a field unbounded by the pleadings and limited in its expanse only by fraud unexplained and undefined, and to permit them, unguided by the principles upon which fraud is determined, to find its existence and pertinency to the case upon mere conjecture.

The complaint of appellant Kokernot to the ninth paragraph of the general charge, is that it requires a verdict against him, in the event of a verdict against C. M. Wells, if the debt secured by the mortgage was pre-existing, while the undisputed evidence establishes that the debt and mortgage were contemporaneous. It will be observed from a reference to the pleadings that the ground alleged for a cancellation of the mortgage is that Kokernot took the mortgage with notice of the facts plead by plaintiff against C. M. Wells, and with knowledge that the deed to the latter was upon an inadequate consideration and fraudulent. There is no allegation that the debt secured by the mortgage was pre-existing. The testimony of Mr. Kokernot, which is the only evidence upon the

subject, clearly proves that the debt was created at the time the mortgage was given and contracted in view of it as security. Therefore the court erred in instructing the jury to find against Kokernot upon a ground that the uncontroverted evidence shows did not exist.

While we are on the phase of the case affecting Kokernot, we will say that the evidence does not tend in the least to prove that he had any knowledge of the alleged facts by reason of which plaintiff seeks to avoid his deed to C. M. Wells, or of any fact which would put a reasonably prudent man upon inquiry, unless such fact appeared from the deed itself. Unless such fact was apparent from the deed, or from the nature of the estate conveyed. it is presumably fraudulent (questions which will be considered with other assignments), there is no theory presented by the evidence upon which the decree canceling the mortgage can be. allowed to stand.

It is complained by appellants that the tenth paragraph of the court's general charge presented the only phase of the case upon which the jury were authorized to return a verdict in their favor, and that the court erred in not fully submitting to the jury the defensive matters plead by them.

It will be noticed from our statement of the pleadings that several distinct transactions were plead as separate acts in ratification on the part of appellants of the original contract. Only one of these transactions was submitted by the general charge to the jury. But upon all of them, except the lapse of time, as well as on other matters plead by appellants, special charges were requested by them and given by the court with certain qualifications, as will be seen from the copies thereof incorporated in this opinion. The error in not submitting these defensive matters is cured, therefore, by the special charges given, unless the court erred in its qualification of them. It is contended by appellants that the court did so err. Each special charge requested by appellants upon the issue of ratification contained this qualification: "If the act of ratification is simply a continuance of the former transaction, or if the party wrongly supposes that the original contract is binding, or if he has not full knowledge of all the material facts, and of his rights, no act of confirmation is effectual."

It is well settled that if a party originally possessing the right of action to set aside a transaction on the ground of fraud has obtained full knowledge of all the material facts involved in the transaction, and has become fuly aware of its imperfection and of his own rights to impeach it, or ought, and might with reasonable diligence have become so aware, and all undue influence is wholly removed so that he can give a perfectly free consent, and he acts deliberately, and with the intention of ratifying the voidable transaction, then his confirmation is binding, and his right of action destroyed. If, on the other hand, the original undue influence still remains, or if the act is simply a continuation of the former transaction, or if the party wrongly suppose that the original contract or transaction is binding, or if he has not full knowledge of the

material facts, and of his own rights, no act of confirmation, however formal, is effectual. 2 Pom. Eq., sec. 964.

The evidence is uncontroverted that the appellee did the acts plead by appellants in ratification or confirmation of the original contract. If it should be conceded that the original transaction between the parties was fraudulent, and on that account voidable, it is apparent from its very nature that it was a complete and finished transaction. It is equally apparent from the nature of the acts plead in ratification of it, that such acts form no part of the original contract, and are such that could not have been contemplated or anticipated by C. M. Wells at the time of the original transaction, and therefore can not be a continuance of it. Whatever may be said upon the question of fraudulent procurement by C. M. Wells of the original deed from appellee, it can not be questioned that the evidence shows an entire absence of fraud in the subsequent transaction evidenced by writings, signed by appellee, plead by appellants in ratification. These subsequent agreements were not suggested by Wells, but were proposed by the appellee himself, and when proposed and entered into by him, his capacity to make them is fully shown. They disclose a knowledge on his part of the terms of the original contract, for upon it they are predicated. He then knew, or had ample means of knowing, the value of the property conveyed to him in consideration of the property he had deeded to C. M. Wells. While he may not have known the value of the property he had conveyed, it appears he did not seek or inquire from the executor or anyone else to find out what the property he had deeded to Wells was worth, or the relation of its value to the value of the property he had obtained in consideration for his conveyance. He knew then as well as he ever did, his condition and the influences which surrounded him when he made the original contract. For one to wrongly suppose that a contract, not void on its face or from its very nature, is binding, he must necessarily be ignorant of the material facts involved in the transaction, and such ignorance must not arise from the failure to exercise reasonable diligence in ascertaining such material facts; for if such facts are known, or he is charged with knowledge of them, it is to be presumed that he knew their legal effect. If such facts as he knew, or was charged with knowledge of, render a contract invalid, he can not be said to wrongly suppose that the original transaction is binding. The supposition that a transaction is valid by one with knowledge of the facts, or means of their knowledge, which render it invalid, must certainly arise from ignorance of the law pertaining to such facts, and equity will not relieve one from the consequence of such ignorance. To wrongly suppose from such ignorance that a contract obtained by fraud is valid is not alone sufficient to prevent the party from ratifying it. We are of the opinion that the court erred in qualifying the special charge asked by appellants upon their pleas of ratification, and that the error in the court's general charge in not submitting each of said pleas to the jury was not cured by giving the special charges so modified.

Appellants asked the court to instruct the jury, "that a party who seeks to rescind a sale or contract for fraud must act with vigilance and promptness, and it is his duty to disaffirm within a reasonable time after the discovery of the fraud; and if J. M. Houston, after he had discovered that he was in anywise defrauded, kept the property which he had received and treated it as his own by exercising acts of ownership over it, and afterwards offered it for sale, that such acts would amount to acquiescence, and to find for defendant'."

The pleadings and evidence raise the issue sought by this charge to be submitted, and it is well settled that a party having recognized a contract as existing, and having done something to carry it into effect, and to obtain or claim its benefits, and having thus taken his chances, can not be suffered to repudiate the transaction, and allege its voidable nature. The court erred in refusing to give this charge.

The assignments of error which complain of the court's overruling the special exception of J. B. Wells to plaintiff's petition, and in giving the second special charge upon the subject of conspiracy, asked by plaintiff, will be considered together. It is not necessary to reiterate the pleadings of plaintiff wherein J. B. Wells is sought to be held liable as a co-conspirator, nor the special charge referred to.

The law is that where a man has conspired with others to cheat and defraud the plaintiff in the sale of certain property by fraudulent concealments or misrepresentations, and the fraud has been perpetrated accordingly, though by some other member of the conspiracy, he will be liable, even where he himself has not made any of the misrepresentations complained of. Bigelow on Frauds, 247. But where one has made no misrepresentations, nor done anything to induce the plaintiff to make the sale, the fraudulent conspiracy must be alleged and established before he can be held liable. The mere general averment, without setting out the facts upon which the charge of fraudulent conspiracy is predicated, is insufficient. It is essential that the facts and circumstances which constitute it should be set out clearly, concisely, and with sufficient particularity to apprise the opposite party of what he is called upon to answer. 9 Enc. of Pl. and Prac., 686, 687, and authorities there cited. No facts which would tend to show a fraudulent conspiracy entered into by J. B. Wells with C. M. Wells to defraud the plaintiff in the sale of his property are alleged or proven. That he is the father of C. M. Wells; that he was the friend and partner of plaintiffs' father; that he was acquainted with the value of the latter's estate; that he was a professed friend of its executor and of plaintiff, are not such allegations of facts, in the absence of allegations or facts showing some fraudulent agreement or act between him and C. M. Wells, to defraud the plaintiff. According to the uncontradicted testimony, J. B. Wells was not known in the transaction by the plaintiff. He did nothing to induce his son to make the contract, but advised him against it. The transaction was one that did not concern him, and his failure to meddle in it after he knew the trade was contemplated by his son, can not be taken as evidence of a fraudulent con-

spiracy, even if it had been alleged. His exception to the petition should have been sustained, and, though overruled, the special charge referred to should not have been given.

It is contended by the appellee that the deed from him to C. M. Wells conveyed expectancies or estates in expectancy, and that the consideration paid was inadequate, and that by virtue of these facts he is entitled to have the deed canceled, without regard to the existence of any other grounds of relief, and that therefore the errors, if any, of the trial court in submitting other grounds of relief are harmless.

It is said that "it is incumbent upon those who deal with an expectant heir relative to his reversionary interest to make good the bargain; that is, to be able to show that a full and adequate consideration was paid. In all such cases the issue is upon the adequacy of price. No proof of fraud is necessary; and the relief is given upon the general principle of mischief to the public, without requiring particular evidence of actual imposition." Gowland v. De Faria, 17 Ves., 20. This seems to be the English rule. But, says Perry on Trusts, fifth edition, section 188: "In this country the rule may be stated with still more severity that the sale by the heir of his expectancy during the life of the ancestor is contrary to public policy and is void, unless such sale is assented to by the ancestor and supported by an adequate consideration." However, in Hale v. Hollon, 90 Texas, 427, the Supreme Court of this State questions the consent of the ancestor as essential to its validity.

To bring the case within the rule governing a sale by an heir or reversioner of his expectancy or reversionary interest, the appellee asserts (1) that the interest that J. M. Houston had in his father's estate was under the terms of the will a remainder; (2) if not a remainder, it was an estate in expectancy to which the equitable rule is applicable.

A remainder is what is left of an entire estate in lands after a preceding part of the same estate has been disposed of, whose regular termination the remainder must await. 2 Minor's Inst., 331; 2 Blackstone, 164. "The essential characteristics of a remainder are, (1) there must be a precedent particular estate whose regular termination the remainder must await; (2) the remainder must be created by the same conveyance and at the same time as a particular estate; (3) the remainder must vest in right during the continuance of the particular estate, or eo instanti that it determines; (4) no remainder can be limited after a fee simple. The necessary features of a remainder arise out of the definition. The definition describes a remainder as the remnant of the whole after a *part* has been disposed of. It follows therefore, of course, that there must be *that part* in order to fulfill the definition." 2 Minor's Inst., 331, 332. None of these characteristics of a remainder are present in the estate that J. M. Houston took under his father's will. By the will the testator's whole estate vested immediately upon his death in his wife and children, the property devised being subject to the payment of the testator's debts. The estate was not conveyed by the will to the executor, nor did any legal or equitable title vest in him. He was given by the

will certain powers over the property for the purpose of settling the debts of the testator and managing it for the use of the beneficiaries until the youngest child should attain her majority or marry. But the title of the entire estate vested, upon the death of the testator, in the devisees, of whom J. M. Houston was one. There was no particular estate for a term of years in the executor, or in anyone else. During the time it was in the hands of the executor he was required to manage the estate for their benefit. No part of the estate was disposed of. There is no remnant, no remainder, but the devisees took the whole of it by the will, with no intervening estate in anyone else for any period of time.

Having determined that the interest appellee conveyed in his father's estate was not a remainder, we will next inquire whether it was an estate in expectancy to which the equitable rule before stated is applicable. The phrase 'expectant heir' is used not in its literal meaning, but as including every one who has either a vested remainder or a contingent remainder in a family property, including a remainder in a portion as well as a remainder in an estate, and every one who has the hope of succession to the property of an ancestor, either by reason of his being the heir apparent or presumptive, or by reason of the expectation of a devise or bequest on account of the supposed or presumed affection of his ancestor or relative. More than this, the doctrine as to expectant heirs has been extended to all reversioners or remaindermen." 2 Enc. of Law, 2 ed., 764. A legatee whose legacy is not to be paid for several years is not an expectant. Parmalee v. Cameron, 41 N. Y., 392. The equitable doctrine in respect to catching bargains with expectant heirs and reversioners and others in like predicament assumes that one party is defenseless and exposed to the demands of the other under the pressure of necessity. It assumes also that there is a direct or implied fraud upon the parent or other ancestor, who from ignorance of the transaction is misled into a false confidence in the disposition of his property, so that, without his knowledge and consent, he diverts his bounty from the heir to a stranger. To illustrate: Had J. M. Houston, prior to R. A. Houston's death, conveyed to C. M. Wells all of the interest in his father's estate that he might inherit or take as devisee, such conveyance would have been of an expectant interest and a fraud upon R. A. Houston who, from ignorance of the transaction, would have been misled into a false confidence in the disposition of his property, and without his knowledge and consent his bounty would have been diverted from his son to C. M. Wells, a stranger. It would then have been incumbent upon Wells to show that he paid a full and adequate consideration, and no proof of fraud would have been necessary to entitle appellee to relief. But the case made by the pleadings and proof does not constitute the appellee an expectant heir as to the property devised by his father's will, or the property sold an estate in expectancy to which the equitable rule is applicable.

The eighth paragraph of the court's general charge and the fourth special charge given at the request of plaintiff are assigned as error. It

will be noticed that the paragraph of the general charge contains this sentence: "The deed from J. M. Houston to C. M. Wells shows upon its face the conveyance of an expectancy in so far as the conveyance of his expectant interest in the estate of his mother, brothers, and sisters of plaintiff is concerned, and the defendant Kokernot was thereby put upon inquiry as to the adequacy of the consideration of the property conveyed by said deed, and should you fail to find that such consideration was adequate, you will find for plaintiff against defendant Kokernot, so far as his mortgage may affect such expectancy." The special charge referred to leaves it for the jury to determine whether the knowledge of Kokernot arising from the presumption of fraud which attaches to the conveyance of Houston to Wells of the former's expectancy in the estates of his mother, brothers, and sisters was sufficient to put a reasonably prudent man upon inquiry as to whether the deed from J. M. Houston to C. M. Wells conveying the former's interest in his father's estate was procured by fraud. It then requires the jury to find, in the event that it was sufficient to put a reasonably prudent man upon inquiry, and the inquiry would have led to a knowledge of such fraud, that Kokernot was not an innocent purchaser. The paragraph of the general charge referred to instructs the jury that Kokernot was by the conveyance of said expectancies put upon inquiry as to the adequacy of the consideration paid for the entire property, and the special charge permits the jury to find, from the conveyance of the expectant interests, that the deed to the grantor's interest in his father's estate was fraudulent. Kokernot, in taking the mortgage, was charged with knowledge of the contents and legal effect of the recitals in the deed under which C. M. Wells claimed the property mortgaged. He is thus charged with knowledge that the conveyance of the expectancies by J. M. Houston in the estate of his mother, brothers, and sisters was void, unless supported by an adequate consideration. The consideration paid for the interest in his father's estate and for the expectancies was for all the property, and is inseparable and indivisible. It can not be said that so much was paid for the interest of J. M. Houston conveyed in his father's estate, and so much was paid for the interests he conveyed in the expectancies. Kokernot then, in order to ascertain whether the sale of the expectancies was supported by an adequate consideration, must necessarily have been compelled to ascertain whether the consideration paid for the interest conveyed by J. M. Houston in his father's estate was adequate. He could not ascertain whether the consideration paid for a part was adequate or inadequate without finding out the same fact as to the consideration paid for the whole. It does not follow, however, that if he ascertained, or could by exercising reasonable diligence have ascertained, that the consideration was inadequate, that his mortgage would be void as to any part of the property save the expectancies, nor did the court so instruct the jury. What we have said as to the eighth paragraph of the general charge demonstrates that the court properly submitted as a question of fact to be determined by the jury whether the knowledge of Kokernot of the

facts recited in the charge and the legal presumption attaching to them was sufficient to put a reasonably prudent man upon inquiry as to whether or not the interest in his father's estate conveyed by J. M. Houston by the deed was procured by fraud. But in connection with these charges the court should have instructed the jury upon the question of acquiescence and ratification raised by the pleadings and evidence. The acts of ratification and acquiescence which the evidence strongly tends to show on the part of J. M. Houston in his contract with C. M. Wells, might by the jury have been considered reasonably sufficient to have prevented a reasonably prudent man dealing with Wells as to the property from making inquiry as to the nature and character of the original transaction. If the acts of acquiescence and ratification were such as would be reasonably sufficient to induce a man of ordinary prudence to believe that the original transaction, by reason of such acts, was binding, then if a man of such ordinary prudence, in his dealing with a party to the original transaction in respect to the property involved in it, knew of such acquiescence and acts of ratification, and was induced thereby to believe the original contract was then binding between the parties, he will be protected in his contract, although he may have had knowledge of such fact as would put a reasonably prudent man upon inquiry, which, if pursued with ordinary diligence, would have led to a knowledge of the invalidity of the original contract.

It is urged by appellants that as the original trade contemplated a partnership and delivery of cattle in the future, and the property conveyed by Houston consisted of real and personal property, and, as the cattle delivered to Houston were afterwards sold by him without offering to rescind, he can not rescind without first returning the property received as the consideration, the court erred in the twelfth paragraph of its general charge.

The rule that in order for a vendor, who has received a part of the purchase money, to rescind a sale and recover the property, he must first tender the part of the price received to the purchaser, applies to suits brought to recover personal property, and has no relation to suits brought to rescind a contract for the sale of realty, though chattels may also be embraced in the transaction. In equitable suits of this character all that is required of the plaintiff is for him to offer by his pleadings to do equity. The court will, upon consideration of the case, enter such a decree as, under the pleadings and evidence, justice and good conscience require. Parsons v. Cox, 71 Texas, 246. The rule that he who seeks to rescind an agreement upon the ground of fraud must place the other party in as good a condition as he was when the agreement was made, is satisfied if the judgment asked for will accomplish that result. Harris v. Assurance Society, 64 N. W. Rep., 197. The question submitted by the court in the twelfth paragraph was necessary to be determined in order that equity might be done, and the pleadings and facts required its submission.

The value of the property conveyed by J. M. Houston to Wells at the

date of the conveyance should have been considered in determining whether the consideration given in exchange for it was adequate, and the evidence as to value should have been directed to that time. What it was worth at the time of trial is no evidence of its value when sold. The question as to whether it was properly managed by the executor was not an issue in the case, and could not be brought into it to make testimony foreign to the issues involved admissible.

We have faithfully and earnestly endeavored to give the questions involved in this appeal the thorough and careful consideration that the magnitude and importance of the case demands. If, as we believe, we have succeeded in reaching correct conclusions on the issues presented, no apology need be made for the length of this opinion.

The judgment of the District Court is reversed and the cause remanded.

*Reversed and remanded.*

FLY, Associate Justice, did not sit in this case.