## DUCKELS v. DOUGHERTY et al.
### (No. 7932.)

(Court of Civil Appeals of Texas. Galveston. June 30, 1920. On Rehearing, Dec. 8, 1920.)

**1. Cancellation of instruments ⬅41—Petition to cancel deeds on ground of mental weakness, etc., held sufficient on exceptions.**

Petition by a sister to set aside deeds given by her to her brother, on ground of her mental weakness and general overreaching by the brother, *held* sufficient as against special exceptions which were practically general demurrers.

**2. Evidence ⬅501(3)—Lay witness as to mental capacity must disclose facts.**

Testimony of lay witnesses that grantor was mentally incapable of conveying, basing conclusion generally on business transacted by her, but not disclosing to judge the facts on which the opinion was based, was improperly admitted.

**3. Appeal and error ⬅1010(1)—Question of fact for court or jury when reasonable men would differ.**

When a given state of facts is such that reasonable men may fairly differ on the question involved, the determination of the matter is for the judge or jury trying the case, and it is only when the facts are such that all reasonable men must draw the same conclusion from them that the appellate court is authorized to interfere.

**4. Deeds ⬅211(1)—Evidence of mental weakness and overreaching insufficient to sustain findings canceling deeds.**

In suit to cancel deeds given by a sister to her brother soon after the death of their mother, findings of the court canceling the deeds on ground of mental weakness of grantor at time of conveyance, inadequacy of consideration, and general overreaching by the brother, and that deeds were not ratified, *held* not sustained by the evidence.

### On Rehearing.

**5. Appeal and error ⬅1177(7)—New trial necessary where facts were not fully developed in trial court.**

Where judgment for plaintiff in suit to cancel deeds for mental weakness of grantor and general overreaching by her brother, the grantee, must be reversed for insufficiency of evidence to sustain the findings of the court, but the facts may not have been fully developed, the cause will be remanded for a new trial.

Appeal from District Court, Jackson County; John M. Green, Judge.

Suit by Henrietta E. Dougherty and her husband, joined pro forma, against Neil S. Duckels. From judgment for plaintiffs, defendant appeals. Reversed, and cause remanded for another trial.

McCrory & Vance, of Edna, for appellant.

T. H. Ridgeway, of San Antonio, and Rose & Sample, of Edna, for appellees.

LANE, J. This suit was brought by Henrietta E. Dougherty, née Duckels, joined pro forma by her husband, Frank Dougherty, against Neil Duckels, to set aside two deeds by which she had formerly conveyed to said Neil Duckels a certain tract of land situated in Jackson county, Tex.; said deeds bearing date of August 9, 1916, and November 20, 1917, respectively.

Plaintiffs alleged:

That Henrietta E. Dougherty is the sister of defendant, Neil S. Duckels, and that she and Neil are the only heirs of their mother, Henrietta E. Duckels, who died in the city of San Antonio, Tex., on or about the 19th day of April, 1915. That at the time of the death of their mother she was the owner of three certain tracts of land, described as follows: First, one tract situated in Macoupin county, Ill., of the value of $30,000; second, lots 15 and 16 in the city of Jacksonville, in the state of Illinois, of the value of $3,500; and, third, 349½ acres in Jackson county, Tex., of the value of $8,000. They alleged: That their mother also owned certain securities and personal property of the value of $7,000. That their mother left a will by the terms of which she bequeathed to plaintiff Henrietta E. Duckels, now Dougherty, the first two tracts of land and the north half of the tract in Jackson county, Tex., together with all household goods in the house on the second tract above mentioned, all money of which she was possessed, her horse and buggy, all jewelry, spoons and silverware, and all notes or other personal property belonging to the testator at the time of her death; and that she bequeathed by said will to defendant, Neil Duckels, the south half of the tract of land in Jackson county, Tex., the sum of $21,500 that had been advanced to him by his mother prior to her death, the sum of $2,000, and a certain policy of life insurance in the sum of $1,000. That plaintiff has always been of a nervous temperament and possessed of a weak mind, and was under the influence of defendant. That the defendant, soon after the death of their mother, told the plaintiff that she was mentally incapable of managing her business affairs and that he and George Ball, who was one of the executors of said will, were going to procure the appointment of a conservator

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

for her, who would take charge of all her property and would not permit her to dispose of it or use it as her needs might dictate; that a conservator, under the laws. of the state of Illinois, performs duties similar to those of a guardian under the laws of the state of Texas.

That the defendant also told plaintiff that their mother's will was void and that he intended to institute a contest thereof and hold same in court indefinitely and tie up the estate, so that the plaintiff could procure no funds ·upon which to maintain herself. That he accused her of being a spendthrift and in every way possible tried to frighten and intimidate her. That she then being mentally weak and greatly distressed over the death of her mother, and being alone in the world, without any one to whom she could go for advice and comfort, and being beset by the defendant, with his threats to contest said will of her mother, and thereby tie up said estate and withhold the funds from her for an indefinite period of time, and being threatened by·him with a proceeding to have a conservator appointed for her, and being promised by him the sum of $8,000 in addition to a complete half of all the property, real and personal, left by their deceased mother, the plaintiff was induced by the defendant to enter into an agreement, evidenced by an instrument of writing substantially as follows:

"5/13/1915.

"Mr. George Ball, Jacksonville, Ill.—Dear Mr. Ball: In a conference this afternoon relative to matters connected with mother's estate, my sister and I have agreed to the following:

"First. To set aside the will left by mother. In other words to act as though such will had never been made.

"Second. That as matters now stand, I, Neil S. Duckels, agree to allow my sister ($8,000) eight thousand dollars in addition to the half and half settlement. In other words I mean to consider that I owe the estate this amount, same to be added to value of the estate and deducted from my half at time of final settlement.

"It is our opinion that all real estate should be held as it now stands until business conditions at some future time make its disposal in whatever manner it seems best possible.

"[Signed] Neil S. Duckels.
"Nellie E. Duckels."

That after the above-mentioned agreement was entered into, the defendant continued his tyrannical, overbearing treatment toward the plaintiff, and continued threatening her with the appointment of a conservator, and continued threatening to contest their mother's will, until finally, on or about the 15th day of January, 1916, he induced the plaintiff to execute a deed conveying to him an undivided one-half. interest in .the old homestead in the city of Jacksonville, Ill., which is the second tract hereinabove described; and on the same day a deed conveying to

226 S.W.—46

him an undivided one-half interest in the tract of land situated in Macoupin county, Ill., and being the first tract of land hereinabove described.

That there was no consideration whatever passed from the defendant to the plaintiff, Henrietta Ellen Dougherty, for said deeds. That said deeds were the result of the threats, fraud, and overpersuasion of the defendant, Neil S. Duckels, brought to bear upon the weak mind of plaintiff. That the defendant did not pay to her the sum of $8,-000 as specified in the said agreement, and did not pay to her any other sum of money for the ·execution of said deeds.

That not being satisfied with having obtained from plaintiff the two deeds above mentioned, for which he paid no consideration, defendant continued his overbearing and tyrannical treatment toward her, and continued threatening to have a conservator appointed for her, and continued his efforts to overreach her in order to obtain the remainder of the property that was given to her by the will of her mother.

That during all this time defendant continually held over her the threat to have a conservator appointed for her and to contest their mother's will. That, while plaintiff signed a bill of complaint to contest and set aside the will of their mother, she did not know the nature and extent of the same nor the purpose of defendant in having· same filed in the probate court, but that in fact said bill was filed by defendant for the purpose of hindering and intimidating George Ball, the executor of their mother's will, in the execution, of the provisions of said will, and to intimidate her and induce her to convey to him the balance of the property bequeathed to her by the will of their mother, and that after acquiring the agreement of May 13, 1915, hereinbefore set out, and after procuring conveyances from plaintiff in January, 1916, under said agreement, by which she conveyed to him a one-half undivided interest in the two tracts of land in Illinois, defendant told plaintiff that he desired to so arrange her property as to have it produce a sure income during the remainder of her life for maintenance, and that if she would sell to him he would give her the full value thereof. That defendant represented to her ·that he had made arrangements for her to receive the full value of her property in monthly installments and so as to provide for her an income sufficient to support her for a long period of time. That such income would be secured by mortgages or liens upon all of the property that had been conveyed and was being conveyed by the plaintiff to the defendant. That the plaintiff, then being weak in body and mind, did not understand nor appreciate the terms, conditions, and effect of the agreement that she was making with the defendant, but understood that she was get-

ting a lien or mortgage upon all of the property she had conveyed and was conveying to the defendant. That plaintiff, then being in needy circumstances and sorely pressed for funds upon which to maintain herself, remained at San Antonio, Tex., and being alone, without friends or relatives to advise her, and being grieved over the loss of her mother and only companion, and her weak mind being continually upset and burdened by the threats of the defendant to have a conservator appointed for her and to contest and set aside their mother's will, was finally overcome by defendant, and not knowing what she was doing, and not having sufficient mental ability to appreciate the nature and effect of a deed, on or about the 15th day of August, 1916, the defendant procured from her the deed conveying to him her interest in the tract of land situated in Jackson county, Tex., described in the petition; and at the same time the defendant also procured from her deeds conveying to him the remainder of the interest she held in the two tracts of land in Illinois.

Plaintiffs alleged further that Henrietta Ellen Dougherty had possessed a weak and feeble mind from childhood, which fact was known to defendant; that, at the time of the various transactions and the execution of the various deeds and instruments mentioned in plaintiffs' petition, defendant well knew that the plaintiff Henrietta Ellen Dougherty did not possess sufficient mental capacity to understand and appreciate their terms, conditions, nature, and effect, and during these negotiations or trades with him he repeatedly told her that he was acting for her best interest, and for her not to ask the advice of a lawyer.

Plaintiffs alleged further:

That, while defendant had promised to give Henrietta Dougherty a mortgage upon the whole of the property conveyed by her to him to secure the $15,000 note given in part payment for the land last conveyed by her to him, he in fact in preparing and executing said mortgage omitted therefrom one-half of the Virden farm, in Illinois, and inserted in said mortgage, without her consent or knowledge, the following clause:

"The mortgagor has the right to pay the whole of said note at any time and to have a part of said premises released from the lien of this mortgage in case of such part on payment of a pro rata part of the principal of said note. It is the intention of the parties that said note shall not be negotiable, but remain the property of the mortgagee until paid. It is also a part of the agreement, of which this mortgage is a part, that the payments upon the principal of said note may be made in well-secured bonds or first mortgages, bearing an equal or greater rate of interest worth par in the open market and proved as merchantable securities by said bank or any other solvent and reputable bank or banks, selected by the mortgagee."

That plaintiff was never given an opportunity to inspect said note and mortgage, nor to have any one else inspect and pass upon the same for her, but immediately after the execution thereof said note and mortgage were deposited by defendant with F. G. Farrell & Co., bankers, at Jacksonville, Ill. Said note and mortgage were retained by said bank until about August or September, 1918, when they were finally delivered to plaintiff upon her demand. When said note and mortgage were delivered to her, she inspected them for the first time, and then for the first time learned the terms and conditions of said note and mortgage and learned that said mortgage was only upon an undivided one-half interest in one piece of property conveyed by her to the defendant. She then for the first time learned that said mortgage contained a provision giving the defendant the right to discharge the same in other bonds and mortgages. She also learned for the first time that said note was nonnegotiable.

She alleged further that the mother of said plaintiff and defendant at the time she executed said will was of sound mind and possessed ample testamentary capacity, and that said will was valid and could not have been set aside by the defendant, all of which was well known to the defendant; that he threatened to contest the will and threatened to institute a suit to set the same aside, as aforesaid, in order to frighten his sister and force her to execute all of the deeds and instruments herein alleged; and that each and all of the various matters, transactions, acts, and deeds mentioned formed a part of a scheme and plan of the defendant to cheat and defraud his sister, the principal plaintiff herein, out of the property bequeathed to her by her mother.

Plaintiff alleged further that, soon after the execution of the three last deeds from said plaintiff to the defendant, the defendant took possession of the three tracts of land described in the petition and leased and rented the same and kept all the rents and revenues therefrom, up to the date of the filing of this amended petition, which rents amount to about the sum of $5,000; that the amount of rents the defendant has received upon said real estate has far exceeded all of the sums of money that were paid by the defendant to said plaintiff.

The prayer was for a cancellation of the deeds of date August 15, 1916, and November 20, 1917, by which the Jackson county land was conveyed to defendant, and for a recovery of title to said land; and she prayed further as follows:

"Plaintiffs here now tender to the defendant all of the sums of money that this plaintiff received from the defendant, together with a cancellation of the note for $15,000 and the mortgage securing the payment of same, as de-

DUCKELS v. DOUGHERTY
(226 S.W.)

scribed in this petition, upon condition that he reconvey to her all of the aforesaid real estate free from liens. Plaintiffs further pray that the defendant be required to file in court a sworn statment, showing all of the money that he had received as rents upon the three tracts of land, described in this petition, since the date of the death of said Henrietta Ellen Duckels; as well as a statement showing all of the personal property and money received by him from said estate. Plaintiffs further pray that the amount of money the defendant has received as rents upon said real estate be ascertained and that the amount the defendant has paid to the plaintiff, including said $1,000, be ascertained, and that the defendant be given credit or offset against what he has collected as rents, to the extent of the amount he has paid this plaintiff, and that she have judgment over and against him for the remainder.

"Plaintiffs further pray in the alternative for judgment declaring that the defendant received and is now holding the real estate in Jackson county, Tex., described in the copy of the deed hereto attached, in trust for the plaintiff Henrietta Ellen Dougherty, and they further pray that said trust be declared terminated, and that they have judgment canceling the aforesaid deed and divesting all right, title, claim, and interest in said real estate out of the defendant and vesting same in the plaintiff Henrietta Ellen Dougherty. Plaintiffs likewise pray for such other and further relief, both general and special, which may be found permissible to grant under all of the allegations in this petition."

We have done our best by the above and foregoing statement to state the substance of plaintiffs' petition, which covers 31 pages of the transcript, and deem it sufficient for the purpose of this opinion.

Defendant answered by general demurrer, by 50 special demurrers and exceptions, by general denial, and specially pleaded that, after the deeds to the Jackson county and other lands were executed and delivered, the said Henrietta Dougherty at various times confirmed and ratified same, and at times when she was mentally capable of fully understanding what she was doing, and that she did so understand, and with full knowledge of all the facts she has always asserted and claimed ownership of the said $15,000 note executed in part payment for said land; that she has at all times demanded and accepted the payment of the interest due upon said note from defendant; she has repeatedly threatened to sue on said note; that on the 20th day of November, 1917, more than a year after the execution of the deed sought to be set aside she executed a correction deed to defendant so as to properly describe the Jackson county land.

Answering further, defendant says: That the consideration for the conveyance of the Jackson county land to him, together with two other tracts of land, one in Morgan county and the other in Macoupin county, Ill., and all interest of said plaintiff, Henrietta Ellen Dougherty, in the estate of the mother of plaintiff and defendant, was the agreement by defendant to pay all indebtedness against said estate at the time of said contract, to wit, August 9, 1916, and the further payment of $1,000 cash to plaintiff, and the execution to her of the $15,000 note set out in plaintiffs' petition. That he has duly performed his said contract, and his sister has received the $1,000 and the interest payments from time to time, and at no time intimated that she was desirous of setting said contract aside, and never at any time said anything to defendant about her dissatisfaction until after this suit was filed. That at the time his sister sold out to him she knew full well what she was doing and had handled many business transactions prior to this and had a clear knowledge and understanding of the effect of her sale and deed to him, but she had an innate desire to sell which defendant did not cause and could not control, and it was this innate desire to sell and nothing else which caused her to sell. That the Jackson county land, at the time his sister sold same to him, was and is now of the reasonable value of $4,500 in comparison with the balance of the consideration which he received from her, and he says that, if this court rescinds this contract with reference to the Jackson county land, he should have the $15,000 note credited at least for the reasonable value of the defendant's interest in said land which defendant may be forced to reconvey to her in case this contract is rescinded; defendant in no manner, however, waiving his contention, as above in his pleadings set forth, that this contract can only be rescinded by the plaintiff tendering unconditionally a return of said $15,000 note and also other consideration received by her.

Defendant also says that he paid the taxes on land for the years 1916 and 1917, the exact amount of which is duly shown by the tax records of Jackson county, Tex., for which he should be given credit in case of any rescission of this contract, and expenses of about $100, and he asks for credit accordingly.

The cause was tried before the court without a jury. Before proceeding to a trial of the cause on its merits, the court passed upon and disposed of the demurrers and exceptions to plaintiffs' petition. When we look to the order entered making such disposition, it is difficult to determine just which of the demurrers and exceptions were overruled, and which were sustained. This order decrees that all of said exceptions should be overruled except exception No. 19, which should be sustained. Exceptions 1, 2, and 3, are practically general demurrers to plaintiffs' petition and by the order of the court overruled. Exception No. 19 sustained by the court reads as follows:

"(19) And for further exceptions said defendant says that said amended petition is insufficient in the following particulars:

"(20) In that said petition attempts to set

up two inconsistent causes of action without setting same in the alternative, to wit, the cause of action based on fraud, undue influence, and misrepresentations, and the one on mental incapacity.

"(21) In that same fails to set out any facts sufficient for the court to enter any lawful judgment of any kind.

"(22) In that plaintiff fails to tender or offer to tender a return of the money and property which she received as consideration for the deed which she asks the court to set aside, and sets out no sufficient reason why she does not tender return of same.

"(23) In that said petition, in so far as it sets up a cause of action on the ground of mental incapacity to make the deed which is sought to be set aside, is not sworn to."

It seems to the writer that the part of the order which sustains exception No. 19, as he understands it, is in direct conflict with that part which overrules exceptions 1, 2, and 3. However, as it appears from other proceedings had in the trial of the case that the court and both parties to the suit construed the order on exceptions as having the effect to substantially overrule all demurrers and exceptions to the petition, we shall therefore consider it as having such effect.

The demurrers and exceptions having been overruled, the case came on for hearing on its merits.

It is shown that plaintiff Henrietta Ellen Dougherty, who for convenience will be referred to herein as "Nellie," and defendant, Neil S. Duckels, were the children of Mrs. Henrietta E. Duckels, deceased, and that they were her only heirs; that at the time of the death of the mother she was possessed of the property described in plaintiffs' petition, and that she is dead, having died in the city of San Antonio, Tex., on the 19th day of April, 1915; that the mother left a will by the terms of which she made the bequests as alleged by plaintiffs; and that at the time of her death their mother owed $2,000 to $3,000. It was shown that the body of Mrs. Duckels was taken to and buried in the state of Illinois, and that plaintiff and defendant went with the body to said state; that after the burial Nellie and defendant went to the office of a Mr. Worthington, a lawyer, who had the will of Mrs. Duckels and who at their request read the will to them; that, after hearing said will read, defendant told Nellie that he was not satisfied with the terms of the will; that thereafter Nellie returned to San Antonio, and after she had returned Mr. George Ball, named as executor in the will wrote her on May 6, 1915, as follows:

"It is rumored here, and it seems to come from a reliable source, that Neil is going to contest his mother's will and if he does contest the will I can see a long, tedious, costly legal battle looming up before you."

It is shown that on the 13th day of May, 1915, defendant arrived in San Antonio and saw Nellie and told her that he intended to contest their mother's will; that during this conference the two parties signed the following written agreement in triplicate, one of which was retained by each party and one mailed to Mr. George Ball, the executor of said will:

"401 Ave. C, San Antonio, Texas, 5—13—1915.

"Mr. George Ball, Jacksonville, Ill.—Dear Mr. Ball: In a conference this afternoon relative to matters connected with mother's estate, my sister and I have agreed to the following:

"First. To set aside the will left by mother. In other words, to act as though such will had never been made.

"Second. That as matters now stand, I Neil S. Duckels, agree to allow my sister ($8,000) eight thousand dollars in addition to the half and half settlement. In other words, I mean to consider that I owe the estate this amount, same to be added to value of the estate and deducted from my half at time of final settlement.

"It is our opinion that all real estate should be held as it now stands until business conditions at some future time make its disposal in whatever manner it seems best possible.

"Neil S. Duckels.
"Nellie S. Duckels."

The day after this instrument was written, Nellie mailed to Mr. Ball a copy thereof. Accompanying this instrument was a letter written by Nellie to Ball, May 14, 1915, as follows:

"Neil was to see me yesterday and we have talked all matters over, and I got him to write a note what he is willing to do and got him to sign it as I will enclose it and you can see which I am willing to do. I think it will be much the best plan, than to go to law about it, it will cost so much and he seems willing to do the right thing by me, that is the reason I got him to sign this paper, I gave him one copy and I send one to you and one I keep myself. I think it is much better to compromise and I am satisfied with the terms."

On May 22, 1915, Nellie telegraphed Ball as follows:

"Please have Neil appointed executor if you can."

On the 10th day of January, 1916, eight months after the agreement of May 13th was executed, and for the purpose of carrying it out, Nellie executed two deeds conveying to Neil an undivided one-half interest in the two tracts of land in the state of Illinois.

On the 9th day of August, 1916, Nellie and Neil executed the following joint contract, to wit:

"This memoranda of an agreement, made, entered into and executed in consummation of and substitution for all former negotiations and agreements relating to the same subject matter, by Henrietta E. Duckels, often signing her name as Nellie S. Duckels, of San Antonio, Bexar county, in the state of Texas, party of the first part, and Neil S. Duckels, of Santa Monica, county of Los Angeles, state of Cali-

fornia, party of the second part, and being in complete settlement between said parties and acquirement by said party of the second part of all the interest of the party of the first part in the estate of Henrietta E. Duckels, deceased, except the coal under the land in Macoupin county, Illinois, this ninth day of August, A. D. 1916, witnesseth:

"The said party of the first part has sold and conveyed to the said party of the second part all her right, title and interest in and to any and every part of the estate of Henrietta E. Duckels, deceased, late mother of the said parties, not heretofore received by the party of the first part, excepting the vein or veins of coal underlying the land in Macoupin county, state of Illinois, and the right to mine the same, and conveyed all the real estate belonging to said estate vested in the said party of the first part by appropriate deeds of conveyance to the said party of the second part, said deeds being three in number, one conveying the real estate situate in Morgan county, one conveying the real estate in Macoupin county, with the exception aforesaid, both in the state of Illinois, and one conveying the real estate situate in Jackson county, in the state of Texas, for the sum of sixteen thousand ($16,000.00) dollars, and hereby transferring and assigning to said party of the second part whatever interest may remain not disposed of in the personal estate of their said mother.

"It is a part of this agreement, however, that the party of the second part hereby assumes and agrees to pay whatever indebtedness of and by said estate remains to be paid.

"As a part of this settlement the said party of the first part has accepted and received the sum of one thousand ($1,000.00) dollars cash in hand and nonnegotiable note of said party of the second part for the sum of fifteen thousand ($15,000.00) dollars, bearing interest at the rate of five per cent. per annum from and after the first day of October, 1916, and payable in monthly installments beginning with the first day of October, 1917, the principal sum payable by installments of eight hundred ($800.00) dollars, each, payable one of installments of eight hundred ($800.00) dollars on the first day of October, 1921, and a like installment the first day of each succeeding October until the whole of said principal note shall have been paid, with the privilege to the said party of the second part to pay said note at any time; to sell any part of said real estate and thereupon to have release of the part sold on paying a pro rata of said note and, in lieu of money, to make such payments, other than interest with well secured bonds or first mortgages bearing an equal or greater rate of interest, worth par in the open market and approved as merchantable securities by the Merchants' National Bank of Santa Monica, California, or any other solvent and reputable bank or banker selected by the party of the first part.

"Said note is secured by a first mortgage on the undivided half interest the said party of the first part had in and to the southeast quarter section eight (8) in township twelve (12) north and range six (6) west of the third principal meridian, in Macoupin county, state of Illinois, saving and excepting the vein or veins of coal underlying said land and the right to mine the same, now conveyed to the said party of the second part as aforesaid.

"Witness the hands and seals of the said parties of the first and second part to this and another instrument of like import as of the day first aforesaid.

"Henrietta E. Duckels,
"(Nellie Duckels).   [Seal.]
"Neil S. Duckels.         [Seal.]"

Thereafter, on the 9th and 10th days of August, 1916, Nellie, while in San Antonio, Tex., executed three deeds conveying to Neil the property described in the contract of August 9, 1916, reciting the considerations and terms set out in said contract. After the delivery of this deed, the bank at Jacksonville, Ill., sent Nellie for Neil $1,000, and a copy of the joint contract, and deposited with said bank a note for Neil payable to Nellie for the sum of $15,000 executed by Neil and his wife, Fidelia W. Duckels, with conditions and terms as provided in said joint contract of August 9, 1916. This note was secured by a mortgage on a one-half undivided interest in the Virden farm in Macoupin county, Ill.

Referring to the note and mortgage to be given by Neil under the contract of August 9, 1916, Nellie wrote Neil, saying: "You can keep the note and mortgage in a bank at Santa Monica." In reply Neil wrote Nellie, saying:

"Yes, I should also want the note and mortgage which I give you as security on the Virden land to be deposited with the Merchants' National Bank of Santa Monica. It will be safer for you and easier for me to pay my interest."

On the 21st day of September, 1916, Neil wrote the Jacksonville Bank to send the note and mortgage to the Santa Monica Bank, stating this was in accord with his contract with Nellie. On the following dates Nellie wrote George Ball, executor, certain letters, extracts of which are as follows:

On February 28, 1917:

"I see Neil is at his old tricks he wants the earth with a fence around it. He was never satisfied until I sold the three pieces of property to him and his contract does not mention about me turning only the three pieces of property over to him, he is not satisfied with the $23,000.00 mother payed out for him and then I only get $15,000.00 out of the whole estate. * * *

"If Neil did agree to pay the debts you know Mr. Ball as well as I do he is getting the best of everything. * * *

"Neil and I have recently had such a fuss he contends Mother's mining stock belongs to him, and that is not mentioned either, and I have asked an attorney down here and he tells me that he cannot get anything only what is mentioned in the contract"—presumably the contract of August 9, 1916.

March 7, 1917:

"Neil has never payed me one cent but the $1,000.00 he paid me last fall. He is due to

pay me some money this September with interest. * * * I never sold a single thing to Neil but the three pieces of property, this was all I sold him, and he agreed to pay all of the indebtedness of the estate. * * * I have forgotten, did I say I sold out to Neil for $15,000—I should have said he owed me $15,000.00 yet, and I want you to know I am in my right mind, * * * and I am going to have that money if I have to do something to get it, and if Neil bought me all out, he should have had it so specified in his contract."

March 17, 1917:

"In regard to Neil paying me money, he is to pay me $70.00 a month, but he doesn't start until September 1st."

April 22, 1917:

"My contract reads that I sell Neil the three pieces of property, that is all that is mentioned in the contract, so I want to know if he can claim things that are not written in that contract. He claims now the jewelry, mining stock and all of Mother's money belongs to him and the contract does not mention them. I always thought unless each item was mentioned it was no good."

June 28, 1918:

"I want to ask you if you will send me just the letters Neil has written to you since Mother's death so my attorney can see them as he wants to look them over and I want to make a copy of them so I can have them myself so in case anything should happen to you I would have them for future use and I will send them back to you. You told me last winter I could have them and I will send each and every one back to you real soon."

July 20, 1918:

"Inclosed is your receipt and I wish you would find out how much it will cost to have the exact copies made of the letters Neil has written you. Just the ones he has written you are the only ones I want please let me hear in regard to the matter as soon as possible."

July 7, 1918: "I was married May 28th."

On the 15th day of July Nellie filed this suit.

After suit was filed and after Nellie was married, to wit, on July 27, 1918, and August 17, 1918, she was insisting on suit being filed on the $15,000 note, and as late as the 29th day of November, 1918, Nellie had her attorney write to insist upon the collection of said note. In this letter they stated the interest on the note was past due and that Nellie could declare the entire note due, as it provided for 10 per cent. attorney's fees, and that she was insisting upon suit being brought to collect same.

On the 18th day of August, 1918, Nellie wrote Neil:

"This is the second time I have written to you in regard to the $12.50 you owe me for back interest for August and I would also like the interest due September 1st. I would like to have you send it to me by return mail. * * * "

Again, July 27, 1918, she wrote:

"You still owe me $12.50 on back interest. The interest for three months would be $187.50 and you sent me $175.00 so that leaves $12.50 due August 1st, which please send me."

(It will be noted that these letters were both written after Nellie's marriage.)

There are many letters set out in the statement of facts written by Nellie which show that she was peculiarly familiar with and kept in mind all the minute details of her negotiations and final sale of her properties to Neil.

It was shown that on the 20th day of November, 1917, after the execution of the three deeds under the contract of August 9, 1916, Nellie executed and delivered to Neil a deed to the Jackson county land, for which she sues, for the purpose of correcting an error in description. It was shown that Neil paid about $2,500 of the indebtedness against their mother's estate which was assumed by him in the contract of August, 1916. It was also shown that the consideration paid by Neil to Nellie for the execution of the last three deeds, by which she conveyed to him her interest in the estate of her mother after having conveyed to him a one-half interest in the two tracts of land in Illinois, under the agreement of May 12, 1916, was a fair price for said property, and in fact all it was worth at the time of such conveyance.

With reference to matters in controversy, Nellie testified that, when Neil came to see her in San Antonio shortly after the will of their mother had been read, he said he was going to contest the will; that at that time nothing was said about having a conservator appointed for her in Illinois; that at that time she and Neil drew up the agreement of May 13, 1915, to avoid a lawsuit. Testifying further, she said:

"The contract was written in 1915 and I saw him again on July 3, 1916, at San Antonio. * * * On the occasion of that visit my brother agreed that he would buy me out if he could make arrangements up in Illinois for it. He only remained in San Antonio a day on that occasion. * * * I could not say whether he or I brought up the subject of buying me out, we had been corresponding about it for several months. * * * I do not think I received any deeds or anything like that from him for maybe a month after he got there. I did then receive some papers from him, and he always requested me to sign them right away and to send them right back. I do not remember the contents of those instruments. As to whether I received any letter or had any conversation with my brother in which he stated he would secure me in any unpaid portion of the consideration in the event he bought me out, will say I remember telling him that I would sell out if he would give me a mortgage on the whole

of the Virden farm. That was my understanding and the understanding of what he told me."

Again:

"After my brother had bought me out and began paying the interest, I thought I was not going to have any more use for the letters which I received from him from time to time. I did not think I was going to have any more trouble with him, and I destroyed the letters. My brother kept writing me and telling me about having a conservator appointed for me in Illinois—the first time after Mother's death, Mr. Ball kept writing to me to come back to Illinois and saying I ought to be up there. I had intended returning to Illinois. Mr. Ball told me I ought to be up there where he could talk to me while the matters were being settled up, but Neil told me not to go; that Mr. Ball wanted to get me up there where he could have a conservator appointed. My brother told me that in almost every letter, it seems to me. That was the reason I did not go back to Illinois."

Again:

"After Neil had gone back to stay, he did not return until July 3, 1916. I wrote many letters to him during that time and received a good many letters from him. As to whether I did not offer to sell to him at different times various household effects I had in Jacksonville and, in fact, everything I had, I will say that I could not say I wanted to sell, but it was stored away and I was paying storage on it, and I thought then that it would not pay to have it shipped down here to me. I could not say whether Neil wrote me with reference to buying me out, or whether I suggested it to him. I do not know that he made any threat to do anything if I did not sell out. I was anxious to sell out because I could not get hold of the money I needed and there was a big expense paying taxes, etc., and I was receiving no income off of the place."

Again:

"When Neil was through there, he told me he would buy me out if he could raise the money. It may be that Neil wrote me, when I wanted to sell out, that it was a big obligation and that he did not want to get under it, and I may have kept on insisting upon his coming out east and seeing what the debts were against the estate; but I do not remember. I could not say he kept on insisting that he did not want to get under obligations of that kind, but I remember he wrote that it was a big undertaking."

Again:

"It is a fact that the income $15,000 would be more than the income from the land. I figured that, in that way, I would get a larger and more regular income. I do not know for sure whether I knew what I was doing or not when I made this deal with Neil in 1915; I was very much worried. I could not say for sure whether I knew what I was doing or not. As to whether, at the time I was corresponding with him in 1916 about selling out to him, I knew what I was doing, I will say that I knew I was selling to him, and that was about all. I do not know whether I knew that when I made a deed to him I did not own the land any longer or not. Sometimes I would read deeds and sometimes I would not. Neil did not tell me not to read the deeds. I read his letters. I suppose I knew that when I deeded it to him I did not own it any more. I suppose that when I bought the note I knew I owned the note and that he owned the land, but I did not have the note. I do not remember that the bank wrote me that I could have the note if I wanted it. I do not remember receiving any such letter. I may have written and told Neil that he could keep the note and mortgage in the bank in Santa Monica, Cal., if he wanted to; but I do not remember it now. As to whether at the time or just before the deeds were made Neil did not write me and send me a contract of this kind (indicating) embodying our agreement or not, I will say that I signed that, but that I did not understand what he meant at that time."

Again:

"I do not remember that my brother told me, when making this deal, that he had no funds on hand at all and that he would have to depend upon the property for the funds. As to whether he wrote me anything about getting me a mortgage on all of the property, will say I know I understood that he was to give me a mortgage on the whole Virden farm, but not on all of the property I was selling to him. With reference to that portion of the petition which alleges he was to give me a mortgage on all of the property I was selling him, I will say that the way I understood it was that he was to give me a mortgage on all of the Virden farm. I do not remember whether it was my understanding that he was to give me a mortgage on all of the property I was selling him or not. I remember getting a contract before I signed the deed covering the whole of the transaction, but I did not understand it. I did not ask anybody about it."

Again:

"After telling Mr. Ball I was going to file suit, I continued to collect interest from Mr. Duckels during March, April, May, and June. I filed suit in July."

Again:

"Fidelia W. Duckels, wife of the defendant, signed this note because I asked her to sign it. I asked her verbally when she was down here. I do not know why I asked her to sign it, but I had an idea that two names on a note were better than one. She has considerable property of her own; she is of a wealthy family."

She also testified that she told her lawyer in 1918, after suit was filed, to collect the $15,000 note.

It was shown that the laws of the state of Illinois provided for the appointment of a conservator for idiots, lunatics, or notoriously distracted persons, drunkards, or spendthrifts who are incapable of managing and caring for their own estates, and provide a penalty against any person trading with such incapable person.

George Ball, executor, a farmer, testified

that Neil had talked several times to him about having a conservator appointed for Nellie, and expressed the view that she needed one. He testified further that the only opportunity he had of knowing her during the summer of 1916 was through correspondence had with her, and having seen her at her mother's funeral in April, 1915, and without further details as to any of her acts or peculiar conduct, he was permitted over the objection of defendant to testify:

"I do not consider that she was capable of transacting business during the summer of 1916. I base this statement on the business she had transacted and the business that she tried to transact while she was here."

On cross-examination he testified that for a long time after the death of the mother he transacted business with Nellie, loaned her money, managed her affairs under her instructions, paid debts for her to sundry persons under her instructions, and had her to approve his claims against her mother's estate; that on Nellie's order he paid John Leach $212 at one time and $225 at another time; that he accepted a power of attorney from Nellie in 1916, and, testifying further, said:

"It is a fact that, under this power of attorney, I proceeded to collect rents, notes, and other claims, release personal and land notes, employ attorneys, file suits, and do other things which I found necessary to the final disposition of the estate in Texas. It is my recollection that the estate matters in Texas were handled principally during the spring, summer, and fall of 1916."

In other words, he testified that he transacted business with and for Nellie under her instructions without questioning her capacity to transact any kind of business.

John Leach, a farmer, after having testified that he was related to Nellie and had known her all her life, and had seen her after her mother's death and had corresponded with her, was permitted over the objection of defendant to testify and did testify as follows:

"I do not know that I saw or heard from Nellie Duckels on or about the particular date of August 9, 1916, but from what I know of her and heard from her, both before and after that date, it is my opinion that at that time she was not mentally competent to transact business for herself or anybody else. I think I know—I ought to know—the condition of Mrs. Dougherty's mind during the spring and summer of 1916, with reference to being able and mentally capable of transacting business. I have had business transactions with her. I do not think she was capable of transacting ordinary business at that time. I do not think she ever was strong mentally. She never did act right, and that was true during the spring and summer of 1916, only she seemed more worried at that time. I base my answers above upon the fact that I have known her all my life. She never acted right to me. She and her mother, after

she was a young lady, used to come out to our house frequently. She borrowed money from me. She tried to borrow other money from me. She wired me for money. She wrote me letters about borrowing money.

"The last time I saw Nellie Duckels, now Mrs. Dougherty, was in the spring of 1915, about 10 days after her mother died. I had a good deal of correspondence with her and transacted much business during the last year or so of her mother's life and have also transacted business with her since the death of her mother. * * * Between February 23, 1915, and April 16, 1915, I made four different loans of money to Nellie Duckels, in amounts ranging from $500 to $800, as I remember, upon notes signed by Nellie as follows, 'Mrs. H. E. Duckels, Miss Nellie S. Duckels,' with the exceptions that I think one of the notes referred to was signed by Nellie alone, without the signature of her mother. Shortly after her mother's death, Nellie Duckels wired me for $800, and I sent it to her. * * * In my opinion the mental incapacity of Nellie Duckels, mentioned by me upon my direct examination, has always existed, and that it is that way yet; that is my opinion about it. * * * I think Nellis was incapable of transacting business at times when I transacted business with her."

Thomas Worthington, a lawyer, testified that he saw Nellie after her mother's death in 1915; that he wrote to her thereafter on several occasions for information concerning her mother's estate, but she did not answer those letters; that he read the contract between her and Neil, of date May 13, 1915, and a letter from her to Mr. Ball of about the same date, and other letters written by her to Neil about their business affairs; that he did not see nor hear from Nellie on or about August 9, 1916. He was then permitted, over the objection of defendant, to testify further as follows:

"Judging from her conduct before and afterward, I am of the opinion that she was not capable of comprehending the nature and effect of her execution of the deed in question. Judging from the facts above enumerated and facts which I learned with reference to her management or mismanagement of her mother's business, I think I know her condition of mind at the time of August 9, 1916, and during the spring and summer of that year, and that she was not at that time and probably never was mentally capable of transacting any important business; that is, unassisted by competent legal or business advice. I think she was very weak mentally during the spring and summer of 1916."

T. A. Mauritz and C. F. Combs, bankers, testified that they knew Nellie for several years prior to her mother's death and had many transactions with her, and that they considered that she had business capacity above the average woman. Other witnesses testified sustantially as did Mauritz and Combs.

Edgar E. Crabtree, vice president of the F. G. Farrell & Co. Bank, testified:

"On August 24, 1916, we wrote Miss Duckels as follows: 'August 24, 1916. Miss Nellie Duckels, San Antonio, Texas—Dear Miss Duckels: Inclosed find draft for $1,000.00, and one copy of contract between you and Neil as per your instructions. The note for $15,000 and mortgage have been duly signed and sent to Macoupin county to be recorded. Yours truly, F. G. Farrell & Co.'

"On September 25th, we wrote to Miss Duckels as follows: 'Dear Miss Duckels: At the request of Neil S. Duckels we wish to say that we hold in our possession in escrow for you the following: Note dated Aug. 9, 1916,· for $15,000.00 bearing 5 per cent. interest from Oct. 1, 1916, signed Neil S. Duckels and Fidelia W. Duckels. Also mortgage covering this note signed by the same parties.' "

There were many letters written by Nellie to Ball, to Leach, to Neil and others, which were introduced in evidence by plaintiff as tending to show the incapacity of Nellie, which we have not referred to in the foregoing statement, as we have reached the conclusion that they have no such such tendency, but, to the contrary, they tend to show that in business matters her capacity was much above the average business woman.

Upon the pleadings and evidence the court found upon material issues:

First. That Nellie possessed a very weak mind from prior to her mother's death down to about the time of the filing of this suit, which rendered her during such time incapable of understanding and appreciating the nature, effect, and consequences of the execution of any deed or contract.

Second. That she possessed an insatiable desire for money, and in order to obtain money she was willing to sell her property at a great loss and sacrifice; that she was a spendthrift and would spend her money but for little or nothing in value or comfort to her; and that Neil knew of these facts.

Third. That the consideration made in the deeds by which Nellie conveyed to Neil the remaining one-half of the three tracts of land, that is, $16,000 and the assumption of an indebtedness of $2,500, was a wholly insufficient and inadequate· consideration for said properties.

Fourth. That the $15,000 note and the mortgage given to secure the same were deposited in a bank, and that Nellie never saw them until the 26th day of August, 1918, after the suit was filed, and until that time she never had a chance to inspect them or know their contents.

Fifth. That Neil represented to Nellie that she would have a lien upon the entire Virden farm to secure payment of said note, and that she believed that said mortgage covered the whole of said farm until the 26th day of August, 1918.

Sixth. That at the time Nellie executed the last three deeds to the three tracts, one of which was a conveyance of the Jackson county land, she did not possess sufficient mental capacity to understand and appreciate the terms and conditions of said deeds and did not have sufficient mental capacity to execute said deeds; that Neil knew of such mental incapacity of Nellie when the deeds were executed; and that with such knowledge he accepted said deeds and paid Nellie $1,000, and with the further knowledge that Nellie would immediately waste the same without any material benefit to her.

Seventh. That after the execution of the three deeds last mentioned, Neil collected rents from the properties conveyed exceeding the sum of $1,000 paid by him to Nellie, which he converted to his exclusive use, and that he also received $500 from the collection of a note belonging to the mother's estate. ·

Eighth. That Nellie is now with the aid of her husband mentally competent to receive and manage her business affairs.

Ninth. That Neil, ¿by and through the various acts and transactions with Nellie, has derived enormous profits therefrom, and that all of said deeds and transactions were inequitable and unconscionable and were not for the best interest of Nellie.

Tenth. That Nellie did not by any acts of hers ratify the sale of said properties.

Eleventh. That after Nellie had conveyed her half of the Jackson county land to Neil, he mortgaged the whole of said tract to secure an indebtedness of his for $3,200.

Upon these findings, and others not necessary to be here mentioned, the court rendered judgment canceling the two deeds executed by Nellie by which she conveyed to Neil one-half of the Jackson county land, and decreeing title to said land to Nellie. The judgment also gave Nellie a lien upon the whole of the Jackson county land to secure her against the mortgage Neil had given upon the entire tract.

[1] We overrule assignments 1, 2, and 3, which complain of the action of the court in overruling appellant's demurrers and exceptions to the plaintiff's petition, having reached the conclusion that the petition is good as against the demurrers, and that the court did not err in so holding, and that no reversible error was committed in overruling the special exceptions addressed to the petition.

In view of the great length of the foregoing statement and the disposition we shall make of this appeal, we feel constrained to forego further discussion· of these assignments.

Upon the trial the witnesses George Ball, John Leach, and Thomas Worthington, were each asked the following question:

"Please state if you know what was the mental condition of Mrs. Dougherty during the spring and summer of 1916, with reference to being mentally capable of transacting business."

Appellant objected to permitting said witnesses to answer such question, for the reason that such question called for a conclusion of the witness and was a mixed question of law and fact. The court overruled the objection and permitted each of said witnesses to answer, and they did answer the same as follows:

George Ball answered by deposition:

"I do not consider her capable of transacting business. I base it on the business she had transacted and that she tried to transact while she was here."

John Leach answered by deposition:

"I think I know. I ought to know. I have had business transactions with her. I do not think she was capable of transacting business at that time."

Thomas Worthington answered by deposition:

"Judging from the facts above enumerated and facts which I learned with reference to her management of her mother's business, I think I know her condition of mind at the time referred to; and that she was not at that time, and probably never was, mentally capable of transacting important business—that is, unassisted by competent legal or business advice."

[2] The action of the court in admitting such testimony is made the grounds for assignments 8, 9, and 10.

These assignments are sustained. The testimony objected to was clearly not admissible. Neither of these witnesses were experts on the question of mental diseases, nor were they offered as such experts. No one of them was a physician. Two were farmers, and the third a lawyer. None of them testified to or undertook to describe Nellie's mental condition, her peculiarities, if any, or in any manner state any unusual or unreasonable act on her part from which the judge who was trying the case without a jury could form a conclusion as to her mental capacity, but only volunteered their conclusions based upon facts not disclosed to the trial judge, whose duty it was to pass upon the sufficiency of such undisclosed facts to show the mental condition of Nellie. We do not think the testimony of these witnesses with reference to Nellie's mental condition at the time of the transactions involved in this suit was of any probative value whatever, and it will be so treated in reviewing the evidence, if any, tending to support the findings of the court upon the question of Nellie's mental capacity to transact business, or to support the judgment rendered.

No witness, especially a nonexpert, should be permitted to give his conclusions as to the mental capacity of another without first stating the particular acts of such other person which might or might not, in the judgment of the court or jury trying the case,

reveal the true condition of such person's mind. Whether the acts done by Nellie discovered by these witnesses while knowing her and transacting business with her, but undisclosed to the court, indicated a weak mind, was a question for the trial judge to determine, and not these witnesses. Williams v. Livingston, 52 Tex. Civ. App. 275, 113 S. W. 786; Brown v. Mitchell, 88 Tex. 367, 31 S. W. 621, 36 L. R. A. 64; Railway Co. v. Roberts, 101 Tex. 418, 108 S. W. 808; Baker v. McDonald, 159 S. W. 450; and numerous authorities cited in above cases.

In Brown v. Mitchell, supra, it is said:

"The negative of this proposition is that no witness, whether he be a subscribing witness, an expert, or a nonexpert, will be permitted, over * * * objection, to state his opinion of the capacity of the testator, or the maker of any contract, to make such instrument, when such opinion assumes the shape and has the effect of being an opinion upon the legal capacity of the party in question."

In Williams v. Livingston, supra, it is said:

"The seventh assignment of error involves the question whether it is permissible for a witness who has shown himself qualified to testify as to one's mental condition or state to give it as his opinion that such a one did not have sufficient mental capacity to 'transact business.' It is held that 'what is sufficient capacity to transact business' is a matter of law; depending somewhat upon the nature of the business. As is said in Fairchild v. Bascomb, 35 Vt. 416: 'A witness may not correctly apprehend the rule of law, and, if he uses such an expression, may be misled himself or may mislead the jury.'"

[3, 4] The main and controlling contention presented, which if decided favorably to appellant, will render the discussion of any further assignment unnecessary, is that there is no evidence to support the material findings of the trial judge, by which the judgment rendered must be supported.

If, after discarding all adverse evidence and giving credit to all evidence favorable to the plaintiff Nellie, and indulging every legitimate conclusion favorable to her which may have been so indulged from the facts proven, the judge, trying the case without a jury, might have found in her favor, then there is evidence to support the findings and judgment of the court.

In other words, when a given state of facts is such that reasonable men may fairly differ upon the question involved, the determination of the matter is for the judge or jury trying the case. It is only when the facts are such that all reasonable men must draw the same conclusion from them, and where the fact findings of the trial court are adverse to such conclusion, that the appellate court is authorized to interfere with the fact findings of the trial court.

We have carefully examined and consider-

ed all the evidence and circumstances proven favorable to plaintiff, disregarding all evidence adverse thereto, and after such examination and consideration have reached the conclusion that from these facts and circumstances all reasonable men can draw but one conclusion, and that is that they do not support the material findings of the court hereinbefore set out, nor the judgment rendered, but to the contrary, they do conclusively show that at the time Nellie executed the contract of August 9, 1916, and all the deeds under its terms, she was fully capable of understanding, and that she did understand and appreciate, what she was doing, and that of her own free will she intended to and did convey to Neil the three tracts of land described in said deeds for the consideration therein expressed; that they do conclusively show that the lands conveyed by said deeds were not worth more than the price paid therefor by Neil, and that Neil derived no enormous profit out of his transactions with Nellie; and that they do unquestionably and conclusively show that, long after Nellie fully understood and appreciated all the details of her transaction with Neil, she collected interest due on the $15,000 note given in part payment for the land conveyed by her, and even after her marriage and after she filed this suit she sought benefits under the contract which she now, by this suit, seeks to rescind; and that by accepting such benefits she ratified the contract, and cannot now repudiate the same and avoid its provisions.

In the case of Evans v. Goggan, 5 Tex. Civ. App. 129, 23 S. W. 854, it was held that fraud may be ratified and remedies against it may be lost by acquiescence; that is, as is said by Pomeroy, by some act, not deliberately intended to ratify, but recognizing the transaction as existing, and intended in some extent at least to carry it into effect, and to obtain or claim the benefits from it. 2 Pomeroy, Eq. Jur. §§ 964 and 965.

In Wells v. Houston, 23 Tex. Civ. App. 629, 57 S. W. 584, it is said:

"It is well settled that a party having recognized a contract as existing, and having done something to carry it into effect, and to obtain or claim its benefits, and having thus taken his chances, cannot be suffered to repudiate the transaction, and allege its voidable nature."

In 3 Pomeroy's Equity Jurisprudence, §§ 964 and 965, the following rule is stated:

Section 964. "Where a party originally had a right of defense or of action to defeat or set aside a transaction on the ground of actual or constructive fraud, he may lose such remedial right by a subsequent confirmation, by acquiescence, and even by mere delay or laches. * * * Contracts which are merely voidable because contrary to good conscience or equity may be ratified, and thus established. If the party originally possessing the remedial right has obtained full knowledge of all the material facts involved in the transaction, has become fully aware of its imperfection and of his own rights to impeach it, or ought, and might, with reasonable diligence, have become so aware, and all undue influence is wholly removed so that he can give a perfectly free consent, and he acts deliberately, and with the intention of ratifying the voidable transaction, then his confirmation is binding, and his remedial right, defensive or affirmative, is destroyed."

Section 965. " * * * The theory of the doctrine is, that a party, having thus recognized a contract as existing, and having done something to carry it into effect and to obtain or claims its benefits although perhaps only to a partial extent, and having thus taken his chances, cannot afterwards be suffered to repudiate the transaction and allege its voidable nature."

The trial court in effect found that about July 18, 1916, the date this suit was filed and after Nellie had married, she had regained her capacity to transact her business affairs, and that with the aid of her husband she was mentally competent to receive and manage the same.

The undisputed evidence shows that long after this suit was filed, and at a time when under the findings of the trial court she was competent to receive and manage her business affairs, she recognized the contract with Neil, which she now seeks to rescind, as existing and tried to collect money from Neil under its terms, and treated the same as existing by threatening to bring suit on the $15,000 note given by Neil in part payment for the land which she now seeks to recover. Having thus claimed and taken benefits under said contract at a time when she was competent to transact her business affairs, Nellie cannot now repudiate the transactions culminating in the execution of the contract. Therefore, if it should be conceded that the contract was executed by Nellie under the pressure of undue influence at a time when she was incompetent to make such contract, still the judgment canceling the deed to the Jackson county land must be reversed, because the undisputed evidence shows the ratification of the contract by Nellie at a time when she was capable of making such ratification.

Having reached the conclusion that there is no evidence to support the judgment rendered in favor of appellees, and that the case has been fully developed, such judgment is reversed, and judgment is here rendered for appellant.

Reversed and rendered.

### On Motion for Rehearing.

In our original opinion we concluded from the evidence that all reasonable men could draw but one conclusion, that is, that such evidence does not support the material findings of the trial court nor the judgment rendered thereupon, but to the contrary it showed that Nellie Duckels, at the time she executed the deed of August 9, 1916, and all

other deeds under its terms, was fully capable of understanding and that she did understand and appreciate what she was doing, and that of her own free will she conveyed to her brother, Neil Duckels, the land describin all of said deeds for the considerations expressed in said deeds. We concluded further that the evidence showed that, even if Nellie was without capacity to execute said deed and thereby convey the property in question, she thereafter was restored to capacity, and that after such restoration, fully understanding the nature of all her transactions with her brother, she ratified all of such transactions and sought benefits thereunder, and therefore she is estopped from rescinding her said contracts and cannot now repudiate the same and avoid their provisions.

Upon these conclusions we reversed the judgment of the trial court and rendered judgment for the appellant.

Appellee, Nellie Duckels, has filed her motion for rehearing and insists that the conclusions so reached by us were erroneous.

[5] After a careful review of the evidence, we are unable to agree with this contention. We are still of the opinion that there was no evidence of probative force to support the judgment of the trial court, and are strongly inclined to hold that the evidence shows a ratification of the contracts in question by Nellie Duckels at a time when she fully understood the effect thereof; but, after a further consideration of the whole case, we have concluded that the facts relative to these questions may not have been fully developed, and for this reason we should have reversed the judgment of the trial court and have remanded the cause for another trial, instead of rendering judgment for the appellant as we did.

We therefore grant the motion of appellee for rehearing, and order that the judgment heretofore rendered by this court be set aside; and further order that the judgment of the trial court be reversed, and the cause remanded for another trial.